[938 NE2d 970, 912 NYS2d 537]

In the Matter of JIMMY D., a Person Alleged to be a Juvenile Delinquent, Appellant. PRESENTMENT AGENCY, Respondent.

Argued September 15, 2010; decided October 26, 2010

418

**POINTS OF COUNSEL**

*Legal Aid Society*, New York City (*Raymond E. Rogers, Steven Banks* and *Tamara A. Steckler* of counsel), for appellant. Under state law and the State and Federal Constitutions, the prosecution failed to prove beyond a reasonable doubt that the 13-year-old appellant's statement was voluntary and not a false

confession where (1) the questioning took place late at night, (2) the police detective asked appellant's mother to leave the room so the detective could interrogate him alone, (3) the detective promised to obtain "help" for appellant if he confessed, and (4) appellant's brief written statement lacked any indicia of reliability because it contained no facts other than those supplied to him by the detective in relaying the complainant's allegations. (*People v Anderson*, 42 NY2d 35; *People v Valerius*, 31 NY2d 51; *People v Huntley*, 15 NY2d 72; *People v Mitchell*, 2 NY3d 272; *Matter of Omar L.*, 192 Misc 2d 519; *Matter of Lance BB*, 14 Misc 3d 359; *People v Hall*, 125 AD2d 698; *Matter of Michelet P.*, 70 AD2d 68; *People v Ward*, 95 AD2d 351; *Matter of Benjamin L.*, 92 NY2d 660.)

*Michael A. Cardozo, Corporation Counsel*, New York City (*Susan B. Eisner, Stephen J. McGrath* and *Norman Corenthal* of counsel), for respondent. Appellant's motion to suppress the inculpatory statement he gave to Detective Figueroa was properly denied. Appellant and his mother knowingly and intelligently waived appellant's *Miranda* rights, and the mother freely consented to allow Detective Figueroa to speak with appellant alone while the mother waited nearby. (*People v Bebeck*, 258 AD2d 660, 93 NY2d 897; *People v Williams*, 62 NY2d 285; *People v Vasquez*, 66 NY2d 968; *People v Sepulveda*, 52 AD3d 539; *People v Rogers*, 34 AD3d 504; *Matter of Chaka B.*, 33 AD3d 440; *Matter of Javier L.*, 272 AD2d 474; *Matter of James W.*, 130 AD2d 753; *People v Ward*, 95 AD2d 351; *Miranda v Arizona*, 384 US 436.)

## OPINION OF THE COURT

PIGOTT, J.

Appellant, Jimmy D., was 13 years old when his nine-year-old cousin reported to family members that Jimmy had sexually abused her. Jimmy's mother took both children to a hospital, where the police were called. A detective from the special victims' squad arrived and arranged for Jimmy, his mother, his cousin, and the cousin's mother to be taken to a child advocacy center.

After initially being placed in separate rooms, Jimmy and his mother sat together in a closed-door waiting room while the detective interviewed the cousin and her mother. The girl described an incident of sexual abuse that had occurred earlier that evening. She added that she was afraid of Jimmy because he had sexually abused her one afternoon four months earlier.

The detective took Jimmy and his mother to a juvenile interview room, where she explained the allegations against him and read *Miranda* warnings to Jimmy in English and to his mother in Spanish, according to their preferences. The version of the *Miranda* warnings that the detective read to Jimmy, designed for use with juveniles, explains each of the rights in simple language. Each time one of the rights was stated, Jimmy responded, without hesitation, that he understood the right; the same was true of his mother. Jimmy's mother also reread the warnings herself and both Jimmy and his mother signed the *Miranda* waivers.

The detective asked Jimmy's mother, in Spanish, for permission to speak with him alone, adding that children sometimes do not feel comfortable talking to a detective in front of a parent. The mother did not respond immediately, but after Jimmy consented to talk with the detective alone, the mother agreed, and left the juvenile interview room.

The detective told Jimmy that he should tell her exactly what had happened, adding that, if he did so, he would get "some help," if he needed it. As the detective later recalled the conversation, she indicated that he would be able to get psychiatric or counseling help, if necessary.* Faced with his cousin's accusations regarding the earlier incident, Jimmy admitted to sexual contact with his cousin. The detective told Jimmy to write what he had done in his own words, gave him pen and paper, and left the room. In a handwritten statement, which he composed while alone in the interview room, Jimmy admitted to a series of sexual contacts with his nine-year-old cousin.

Jimmy and his mother were reunited, and he read his confession to her. At this point, according to Jimmy's mother, she understood her son to say that the detective had told him that she would help him only if he wrote a statement admitting to sexual conduct. The mother and the detective exchanged words, with the detective insisting that she had simply told Jimmy to write down in his own words exactly what he had done. Jimmy was then arrested.

A juvenile delinquency petition was filed in Family Court, supported by a sworn statement of Jimmy's cousin. When the

---

* It is true, as the dissent points out, that her testimony also contains confusing references to a "lawyer," but there is no basis in the record for inferring that Jimmy was led to believe that he would have to confess if he wanted to be represented by counsel; he had just been told, in unequivocal terms, that he could have a lawyer without charge if he wanted one.

presentment agency gave notice that it intended to introduce his confession, Jimmy moved to suppress the statement. Following a suppression hearing, Family Court denied the motion.

Following a fact-finding hearing, Family Court ruled that Jimmy had committed acts that, if committed by an adult, would have constituted the crimes of first-degree criminal sexual act, third-degree criminal sexual act, sexual misconduct, second-degree unlawful imprisonment, second-degree course of sexual conduct against a child, attempted first-degree sexual abuse, and attempted third-degree sexual abuse. Family Court adjudicated Jimmy a juvenile delinquent and placed him on probation for 18 months, conditioned on cooperation with sex offender counseling.

At the Appellate Division, Jimmy argued, among other things, that the presentment agency had not met its burden of proving the voluntariness of his confession. The Appellate Division modified Family Court's order by dismissing the sexual misconduct and unlawful imprisonment counts, but otherwise affirmed, rejecting Jimmy's voluntariness challenge (63 AD3d 737 [2009]). We granted Jimmy leave to appeal (13 NY3d 843 [2009]) and now affirm.

When a police officer takes a child under the age of 16 into custody for juvenile delinquency, the officer must "immediately notify the parent or other person legally responsible for the child's care, or if such legally responsible person is unavailable the person with whom the child resides, that the child has been taken into custody" (Family Ct Act § 305.2 [3]). The child must be advised of his *Miranda* rights and, if the parent or other person in loco parentis who was notified of the arrest (henceforward "parent") is present, that person must be similarly apprised (Family Ct Act § 305.2 [7]).

Recognizing that special care must be taken to protect the rights of minors in the criminal justice system, New York courts carefully scrutinize confessions by youthful suspects who are separated from their parents while being interviewed. In *People v Bevilacqua*, we held that the "continuous, unusual, and deliberate isolation" of an 18 year old from potential avenues of assistance from his family or other supportive adults required suppression, as a denial of the right to counsel (45 NY2d 508, 514-515 [1978]; *see also People v Kern*, 149 AD2d 187, 217 [2d Dept 1989]; *People v Ventiquattro*, 138 AD2d 925, 929 [4th Dept 1988]). Similarly, in *People v Townsend*, we ruled that a confes-

sion must be suppressed if it was obtained from a child under the age of 18 after the police ensured by means of deception and trickery that the child's parents would not take steps to retain a lawyer (33 NY2d 37, 41-42 [1973]).

In light of these statutory and common-law principles, we reiterate that, when a parent is present at the location in which a child under the age of 16 is being held in custody, the parent must not be denied "an *opportunity* to attend [the] custodial interrogation" (*People v Mitchell*, 2 NY3d 272, 275 n 11 [2004] [emphasis added]). In practical terms, this means that the parent of the child has the right to attend the child's interrogation by a police officer, and should not be discouraged, directly or indirectly, from doing so. The better practice for the interviewing officer or detective is to inform the parent that the parent may attend the interview if he or she wishes. Of course, a parent may choose not to be present when a child is being interviewed, but the police should always ensure that the parent is aware of the right of access to his or her child during questioning. If a parent is asked to leave, the parent should be made aware that he or she is not required to leave.

The advantages of having a parent present during custodial interrogations are many. A parent may help a child understand the *Miranda* warnings, so that the child can consciously and voluntarily choose whether to waive or to exercise his constitutional rights to remain silent, to have an attorney present at his questioning, and to have an attorney provided for him without charge if he is indigent. As we have noted, juveniles charged with delinquency may not fully "understand the scope of their rights and how to protect their own interests. They may not appreciate the ramifications of their decisions or realize all the implications of the importance of counsel" (*Mitchell*, 2 NY3d at 275). If the child chooses to waive his rights under *Miranda v Arizona* (384 US 436 [1966]), the parent who is present at questioning is able to monitor the interrogation lest the police engage in coercive tactics. In short, "[t]he emotional and intellectual immaturity of a juvenile creates an obvious need for the advice of a guardian . . . at an interrogation from which charges of juvenile delinquency may ensue" (*Matter of Michelet P.*, 70 AD2d 68, 71 [2d Dept 1979]).

However, it does not follow as a matter of law that a child's confession obtained in the absence of a parent is not voluntary. Neither the Family Court Act nor our precedent interpreting that statute give a child under 16 years the absolute right to the

presence of a parent during interrogation. In fact, the Family Court Act expressly contemplates the possibility that the police may be unable to contact the parent of a child in custody, despite "every reasonable effort" (Family Ct Act § 305.2 [4]), or that a notified parent may be unable or unwilling to be present at the location of custody (*see* Family Ct Act § 305.2 [7]). Moreover, whether a confession was, beyond a reasonable doubt, voluntary is a mixed question of law and fact (*see e.g. People v Scott*, 86 NY2d 864, 865 [1995]), and is to be determined from the "totality of circumstances" (*People v Tankleff*, 84 NY2d 992, 994 [1994], quoting *People v Williams*, 62 NY2d 285, 289 [1984]).

Because voluntariness is a mixed question of law and fact, our review is limited to deciding whether the Appellate Division's finding is supported by evidence in the record. In the present case, Jimmy and his mother were not so isolated from one another at the child advocacy center as to affect the likelihood that his confession was voluntary. Jimmy's mother accompanied him to the center, and mother and son had an opportunity to talk there, when they were waiting together alone in the closed-door waiting room. Jimmy's mother was present during the waiver of his *Miranda* rights. Both Jimmy and his mother agreed to his being questioned outside his mother's presence, and there is no evidence that Jimmy asked for her during the questioning; nor were Jimmy's whereabouts concealed from his mother.

The detective took care to read a version of the *Miranda* warnings that explains the rights in simple language. Both Jimmy and his mother responded unhesitatingly when asked whether they understood each right waived. Although Jimmy was doubtless tired, there is no evidence that he asked for food or water and was denied it. Finally, nothing in Jimmy's handwritten confession suggests that it does not express his own recollections.

The detective's promise of "help" did not give rise to any "substantial risk that [Jimmy] might falsely incriminate himself" (Family Ct Act § 344.2 [2] [b] [i]). There is no evidence in the record that the detective's promise would have deceived Jimmy into thinking that if he confessed he would escape unprosecuted or unpunished (*cf. People v Holland*, 48 NY2d 861, 863 [1979]). Rather, there is evidence in the record that the detective told Jimmy that if he was truthful and told everything that had happened, he would receive psychiatric help or

counseling if needed. Jimmy was not offered an incentive to lie; there is no attraction in making a false confession and receiving psychiatric assistance relating to a crime one did not commit.

The dissent, while acknowledging the validity of Jimmy's initial waiver (dissenting op at 427), relies on a novel theory: that the validity of the waiver was vitiated by police misconduct that occurred *after* the waiver (*id.* at 428 ["any representation in the course of the interrogation tending to impair the interrogee's understanding of the consequences of his or her continuing waiver must be deemed to invalidate the waiver and render the product of consequent interrogation inadmissible"]). The dissent does not suggest that Jimmy was tricked or coerced into his initial waiver, or that Jimmy later invoked his rights and failed to waive them a second time. Nor does the dissent adopt the theory actually advanced by Jimmy—that misconduct following the valid waiver rendered his subsequent confession involuntary. Rather, the dissent suggests that, due to misconduct by the police, Jimmy stopped understanding his rights and thereby unwaived them.

The two cases that the dissent cites in support of this theory, *Moran v Burbine* (475 US 412 [1986]) and *United States v Anderson* (929 F2d 96 [2d Cir 1991]), actually contradict it. In *Moran*, the defendant argued that police misconduct following his valid *Miranda* waiver—lying to an attorney who sought to intervene in defendant's interrogation—retroactively vitiated that waiver. But the Supreme Court found that idea "untenable as a matter of both logic and precedent" (475 US at 422). Similarly, in *Anderson*, the District Court found that postwaiver "trickery" retroactively undermined a *Miranda* waiver, making it impossible to find that defendant voluntarily waived his rights, but the Second Circuit held otherwise: "Though the 'trickery' premise is correct, the district court's conclusion respecting the 'impossibility of a waiver' is not" (929 F2d at 98). The Second Circuit then appropriately addressed whether the postwaiver "trickery" had rendered defendant's confession *involuntary* (*id.* at 100-102). In accordance with *Moran* and *Anderson*, we hold that, since Jimmy's *Miranda* rights were validly waived and never reinvoked, the issue is voluntariness, not waiver.

We conclude that there is evidence in the record supporting the findings of the lower courts that the presentment agency met its burden of proving the voluntariness of Jimmy's inculpatory statement beyond a reasonable doubt. This mixed question of law and fact is therefore beyond our further review.

Accordingly, the order of the Appellate Division should be affirmed, without costs.

Chief Judge LIPPMAN (dissenting). The majority has set forth with commendable clarity what the law of this State requires when a parent of a child under the age of 16 is available for and wishes to be present at the child's interrogation by a police officer: "the parent . . . has the right to attend the child's interrogation . . . and should not be discouraged, directly or indirectly, from doing so" (majority op at 422). And, with equally commendable clarity, the majority has explained why such attendance is advantageous to the child and ultimately to the sound administration of justice: the parent can help the child understand the *Miranda* warnings and monitor any subsequent interrogation to deter and, if necessary, bear witness to any official overreaching. As the majority notes, we have previously recognized that juveniles "lack an adult's knowledge of the probable cause of their acts or omissions and are least likely to understand the scope of their rights and how to protect their own interests" (*People v Mitchell*, 2 NY3d 272, 275 [2004]); and, in view of the acknowledged "emotional and intellectual immaturity of [juveniles]," the majority now appropriately reiterates that there is an "obvious need for the advice of a guardian . . . at an interrogation from which charges of juvenile delinquency may ensue" (majority op at 422, quoting *Matter of Michelet P.*, 70 AD2d 68, 71 [2d Dept 1979] [internal quotation marks omitted]).

It is not disputed that respondent Jimmy D.'s mother was available and wished to be present during her son's interrogation, and it is clear that her exclusion was not in accord with what the Family Court Act requires in such circumstances. The majority, however, declines to suppress Jimmy's confession on this ground. While I agree that the exclusion of a parent from the interrogation room should not invariably dictate the suppression of a subsequently obtained juvenile confession, I cannot agree that the exclusion of the parent in this case, when viewed in the context of the ensuing interrogation, should be deemed benign. Indeed, the tactic employed by the detective once the mother had been excluded cannot be viewed except as having vitiated the waiver of rights essential to the admissibility of Jimmy's confession.

Although presented practically as an afterthought by the majority, it would appear crucial to the decision of the respondent's suppression motion that, after the mother complied with the

detective's request to leave the room, the detective, upon encountering resistance from Jimmy, represented to him that he could be helped if he confessed. The detective testified: "I told him he needs to tell me exactly what happened and this way if he needed some help, we would try to get him some help." When pressed as to what sort of "help" she had been referring to, the detective elaborated, "I explained to him that he would have to come to court and the lawyer that he would get [t]here would try to get him help." When asked whether she meant that Jimmy could get help from a lawyer if he made a statement, the detective replied "[t]he help I was telling him was if the lawyer can help him out, get him some help. In other words, if he needed to see someone, you know, whether it was a psychologist or counseling with regards to what he had done." Upon being requested to clarify whether she had suggested to Jimmy that if he confessed, he would get help from a lawyer in court, the detective said, "I told him to write what he did in his way, in his own words and I says maybe they can get you some help." When she was again requested to state whether she had indicated that the availability of a lawyer depended upon Jimmy giving a confession, she answered "I'm not sure if I said lawyer. I could have said it. I'm not sure." Shortly after these representations were made, Jimmy made an admission. He was then told that "he would have to write everything that he said he did on paper because it wasn't right what he did." Jimmy complied, delivering a written statement to the detective at 12:35 A.M. The 13 year old had by then not eaten, or been offered food, in over seven hours and had been without sleep since the early morning of the previous day.

The threshold issue in judging the admissibility of Jimmy's custodial confession in this post-*Miranda* era is not, as it would have been before *Miranda*, whether under the totality of the circumstances the confession itself was voluntary in the sense of being uncoerced, or whether it was elicited by means of representations raising a substantial risk of false incrimination in contravention of Family Court Act § 344.2 (2) (b) (i), but whether the confession was obtained in pursuance of a valid waiver of rights. Since *Miranda v Arizona* (384 US 436 [1966]), of course, the admissibility of a custodial confession depends upon the government's proof of an antecedent waiver of the right against self-incrimination and, relatedly, the right to the assistance of counsel during interrogation: "If the interrogation continues without the presence of an attorney and a statement

is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel" (*id.* at 475). Consistent with, indeed practically entailed by, the Court's requirement of proof of a knowing and intelligent waiver was its dictum that "any evidence that the accused was threatened, tricked, or cajoled into a waiver will, of course, show that the defendant did not voluntarily waive his privilege" (*id.* at 476).

Since *Miranda*, the nature of the judicial inquiry it requires, focusing on the validity of the precedent waiver rather than on the voluntariness of the ensuing confession, has been repeatedly reaffirmed. In *Moran v Burbine* (475 US 412, 421 [1986]), for example, the Court observed

"Echoing the standard first articulated in *Johnson v. Zerbst*, 304 U. S. 458, 464 (1938), *Miranda* holds that '[t]he defendant may waive effectuation' of the rights conveyed in the warnings 'provided the waiver is made voluntarily, knowingly and intelligently.' 384 U. S., at 444, 475. The inquiry has two distinct dimensions. *Edwards* v. *Arizona, supra,* at 482; *Brewer* v. *Williams*, 430 U. S. 387, 404 (1977). First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the 'totality of the circumstances surrounding the interrogation' reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived. *Fare* v. *Michael C.*, 442 U. S. 707, 725 (1979). See also *North Carolina* v. *Butler*, 441 U. S. 369, 374-375 (1979)."

Although the *Miranda* warnings initially given to Jimmy and his mother appear to have been adequate and the immediately ensuing waiver of rights valid, those circumstances are not on this record conclusive of the validity of the waiver when Jimmy's confession was given. It is basic, and evident from the mandated warnings themselves, that a person subject to custodial interrogation may, his or her initial waiver

notwithstanding, at any juncture in the questioning reassert his or her right to remain silent and to consult an attorney. It follows that any representation in the course of the interrogation tending to impair the interogee's understanding of the consequences of his or her continuing waiver must be deemed to invalidate the waiver and render the product of consequent interrogation inadmissible, unless the representations are conclusively shown not to have clouded the interogee's comprehension of the basic risks entailed by continued participation in the interrogation (*see Moran v Burbine, supra; see e.g. United States v Anderson*, 929 F2d 96 [2d Cir 1991]).

Although the majority finds this theory "novel," it is as old as *Miranda* itself, which plainly conditions the validity of an interogee's continuing waiver of rights upon the absence of *"any* evidence that the accused was threatened, tricked, or cajoled into [the] waiver" (384 US at 476 [emphasis supplied]). The majority's evident insistence that subsequent to the initial waiver, the question of whether the waiver remains valid is supplanted by an inquiry into the voluntariness of any ensuing confession, is simply not compatible with the basic waiver theory upon which *Miranda* rests. As Professor Berger has observed:

> "[W]aiver is [and] should remain an issue distinct from the question of compulsion under the fifth amendment. *Miranda* created a system of warnings and waiver to protect against the inherently coercive environment of custodial interrogation. Its predecessor, the voluntariness test, had proven to be ineffective in regulating police interrogation practices. The *Miranda* Court clearly did not intend to replace the voluntariness test under the fourteenth amendment with the compulsion standard of the fifth amendment, without any substantive change in the analysis. This would only have made voluntariness and compulsion the flip sides of the same coin. Voluntary confessions would be those obtained without compulsion, while compelled statements would be considered involuntary. Instead, *Miranda* rejected this rather meaningless exchange of constitutional language in favor of a substantive reworking of admissibility criteria . . . Under *Miranda*, waivers must be voluntary, intelligent and knowing, not just obtained in an atmosphere

free of compulsion" (Berger, *Compromise and Continuity: Miranda Waivers, Confession Admissibility, and the Retention of Interrogation Protections*, 49 U Pitt L Rev 1007, 1053 [1988]).

Contrary to the majority's view, the continuing validity of a *Miranda* waiver is not a nonissue after the waiver has first been made, even in the absence of the waiver's retraction. Logically, every response made during a custodial interrogation is a reaffirmation of the original waiver (*see* Dix, *Promises, Confessions, and Wayne LaFave's Bright Line Rule Analysis*, 1993 U Ill L Rev 207, 255-256 ["(A) suspect has the right after initially waiving counsel to change his mind and invoke the right. A suspect's failure to do this during interrogation is a continuing reaffirmation of his earlier waiver. In a very real sense, a promise made after an initial waiver of counsel may effectively influence a suspect to 'reaffirm' that waiver by failing to demand the right to consult with an attorney before matters go further"]). If the terms of the waiver have by the time of the reaffirmation been misleadingly altered, as they were here, the waiver is no longer valid; the burden cannot be upon the misled interrogee to reassert rights the nature and dimensions of which have, since the initial waiver, been inaccurately or confusingly portrayed. Of course, nothing in either *Moran* or *Anderson* can be understood to impose such a manifestly unfair burden.

Here, it would appear clear, even from the detective's less than transparent account of what she told Jimmy, that when she spoke to Jimmy alone, she made representations significantly at odds with those upon which his waiver had, in his mother's presence, been permissibly based. The detective made repeated offers of "help," but at the same time advised Jimmy that he would have to provide a written statement before "help" could be afforded. The child had been warned only minutes before that "[a]nything you say can and will be used against you in a Court of Law. That means what you say or write can be used to prove [w]hat you may have done." Now, however, he was told something dramatically different—that an admission could be helpful to him and, indeed, that help was contingent upon an admission. When pressed as to what she meant by "help," the detective indicated psychological counseling or legal assistance. But, neither was contingent upon a confession. Jimmy was absolutely entitled to an attorney; it was a gross distortion, again fundamentally at odds with the rights just recited, to intimate that legal assistance in any way depended

upon the giving of a statement; and it is obvious, except perhaps to a child, that a confession to criminal wrongdoing is not a condition of access to psychological counseling.

Although courts, despite *Miranda*'s apparently categorical injunction against threats, trickery and cajolement (384 US at 476), have held that misrepresentations not bearing directly upon the basis of the required waiver will not necessarily invalidate it,[1] "there is an absolute prohibition upon any trickery which misleads the suspect as to the existence or dimensions of any of the applicable rights or as to whether the waiver really is a waiver of those rights" (2 LaFave et al., Criminal Procedure § 6.9 [c], at 827-828 [3d ed] [collected cases omitted]).[2]

Perhaps an experienced adult would not have been misled by representations such as those made by the detective to Jimmy[3]— but we deal here with a child, and to all appearances a very unsophisticated one with no prior involvement with the juvenile justice system, improperly deprived of parental support and guidance at a time when it would have been crucial to the protection of his interests. Upon the undisputed facts of this record, I see no way of concluding that the presentment agency met its "heavy" burden to demonstrate that Jimmy had "knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel" (*Miranda*, 384 US at 475) when he made his confession. The facts before us simply do not permit the properly dispositive legal conclusion that this child, at the time he confessed, had

---

1. In *Moran*, for example, the misrepresentations alleged to vitiate the *Miranda* waiver were not made to the defendant and, thus, could not have affected his decision to relinquish his rights (475 US at 422).

2. It is true that in *United States v Anderson* (*supra*), the court, although acknowledging that postwaiver trickery could affect the continuing validity of a waiver—the proposition for which the case is above cited—declined to adopt a per se rule that any trickery would vitiate a waiver, as had the District Court. However, upon de novo review, the Second Circuit went on to hold, as a matter of law, that the misrepresentations there at issue were materially misleading and thus that Anderson's waiver had been fatally compromised, rendering his subsequently obtained statements involuntary. Although the holding is couched in terms of voluntariness, it is clear that the focus of the court's analysis was upon whether the defendant's waiver of rights had been voluntary under the standard enunciated in *Miranda* and *Moran* (*see* 929 F2d at 100-101).

3. It is noted, however, that even highly experienced adults can be materially misled subsequent to an initial valid waiver. In *Anderson*, for example, the defendant had, by the time of the interrogation there at issue, been arrested 12 times and entered 11 guilty pleas (929 F2d at 99).

the "requisite level of comprehension" "both [of] the nature of the right being abandoned and the consequences of the decision to abandon it" (*Moran*, 475 US at 421).

While the truth or falsity of Jimmy's confession appears unascertainable, it does seem clear that the circumstances attending its exaction—i.e., a tired and hungry child isolated with an experienced interrogator in the middle of the night and offered illusory inducements to confess to specifically described allegations of wrongdoing—are precisely the sort that do produce false confessions, particularly in the young teen age group.[4] If an "incentive to lie" (majority op at 424) were necessary to explain a 13 year old's decision to confess falsely, there certainly was one in this case; the child believed, as he had been encouraged to in his mother's absence, that making the sought confession was the only way he could extricate himself from the extraordinarily aversive situation in which he found himself. Children do resort to falsehood to alleviate discomfort and satisfy the expectations of those in authority, and, in so doing, often neglect to consider the serious and lasting consequences of their election. There are developmental reasons for this behavior which we ignore at the peril of the truth-seeking process.

So long as juveniles cannot be altogether preserved from rigors of police interrogation, it would behoove us not to minimize the now well-documented potential for false confessions when suggestible and often impulsive and impaired children are ushered into the police interview room. Recognition of the distinct hazard presented by that inherently enormously coercive scenario renders it imperative not only that we clarify, as we have, what the Family Court Act requires with respect to parental involvement at juvenile interrogations, but that, where children are concerned, we scrupulously adhere to *Miranda*'s requirement that there be a demonstrably valid waiver of rights, unaffected by threats, trickery, or cajolement, to support the admission of a custodial confession.

---

4. Indeed, research has shown a pronounced willingness to confess falsely among young teenage boys and one study has documented false confession rates of 78% in boys respondent's age (*see* Saul M. Kassin and Gisli H. Gudjonsson, *The Psychology of Confessions: A Review of the Literature & Issues*, 5 Psychol Sci in Pub Int 33, 52-53 [Nov. 2004]).

Judges GRAFFEO, READ and SMITH concur with Judge PIGOTT; Chief Judge LIPPMAN dissents in a separate opinion in which Judges CIPARICK and JONES concur.

Order affirmed, without costs.