OPINION OF THE COURT
Stephen J. Bogacz, J.
Courts have long recognized the existence of a less-than-level playing field when police question youthful suspects. As far back as 64 years ago, the United States Supreme Court acknowledged the need for courts to utilize “special care in scrutinizing the record” concerning police interrogation of an accused 15-year-old male and his ensuing confession. (Haley v Ohio, 332 US 596, 599 [1948].) The Court further observed that “[a]ge 15 is a tender and difficult age .... He cannot be judged by the more exacting standards of maturity. That which would leave a man cold and unimpressed can overawe and overwhelm a lad in his early teens.” (Id. at 599.)
Some years later, New York State’s Appellate Division, Second Department, developed what is now well-settled law in a series of decisions that defined and mandated a standard of “greater care” to protect the rights of young detainees who are questioned by the police. In People v Ward (95 AD2d 351, 353 [1983]), the Second Department liberally quoted the above language from Haley in holding that “[a] child of 15 years of age should not be judged by the more exacting standards of maturity” and suppressed the youth’s admission to the police. Three years later, the Second Department noted that “it is well recognized that. . . the police must exercise greater care to insure that the rights of youthful suspects are vigilantly observed” (People v Hall, 125 AD2d 698, 701 [1986] [emphasis added]), in again *465 relying upon Haley and suppressing another 15 year old’s confession to law enforcement. See also Matter of Robert P. (177 AD2d 857 [1991]), in which the Third Department adopted the Second Department’s analysis.
This standard of “greater care” was subsequently given, slowly and deliberately perhaps, but also most clearly, a more precise definition. In Matter of Chad L. (131 AD2d 760, 761 [2d Dept 1987]), the Court redefined the “reasonable person, innocent of any crime” standard that determines whether a person is in police “custody” when questioned (with custody itself triggering various rights and safeguards, such as the requirement for the police to first administer the Miranda warnings [see Miranda v Arizona, 384 US 436 (1966)]). In Chad L., the Court essentially carved out a “reasonable 10 year old” subset from the greater group to whom the “reasonable person” yardstick applied. This “reasonable juvenile” test developed into settled law in a series of consistent decisions from three Appellate Division departments. (Matter of Robert H., 194 AD2d 790 [2d Dept 1993]; Matter of Rennette B., 281 AD2d 78 [1st Dept 2001]; Matter of Ricardo S., 297 AD2d 255 [1st Dept 2002]; Matter of Angel S., 302 AD2d 303 [1st Dept 2003]; Matter of Dalton BB., 61 AD3d 1105 [3d Dept 2009].)
The additional requirements of “greater care” also impacted the Second Department’s review of how law enforcement personnel must administer the Miranda warnings to children and adolescents. In the first of three cases, the Court acknowledged that age and intellectual capacity were among the factors to be considered in assessing whether a particular youth has voluntarily waived his/her rights under Miranda. It went on to suggest that “an evaluation of these various factors may occasionally require an extra effort to assure that the [Miranda] rights are explained in language comprehensible to the minor suspect.” (Matter of Julian B., 125 AD2d 666, 671 [2d Dept 1986] [emphasis added].) See also Matter of Chad L. (supra), which extended this reasoning to a 10-year-old detainee. In the culmination of this trilogy, the Second Department was unable to “conclude that the People [had] met their burden of proving that [a] 13-year-old juvenile with no prior criminal involvement [had] . . . waived his Miranda rights” after the detective had “read him [those] rights . . . [w]ithout any further explanation.” (People v Gotte, 150 AD2d 488, 488 [1989] [emphasis added].)
It is against this backdrop of developed precedent that this court is asked to assess the voluntariness, as a matter of law, of *466 the statement made to law enforcement by the 10 year old in question. Preliminarily, at the Huntley (see People v Huntley, 15 NY2d 72 [1965]) hearing that was had in this matter, the court had the unique opportunity to observe the demeanor and assess the credibility of the one witness who testified, the police detective. Having done so, the court fully credits her testimony.
At the conclusion of any pretrial suppression hearing, the court is required to render specific findings of fact, and the conclusions of law to be drawn therefrom. The findings of fact are as follows:
On or about May 13, 2011, at approximately 6:00 p.m., the testifying detective met the 10-year-old respondent at the offices of the Queens Child Abuse Squad. The respondent had been brought to that location by his mother, after the detective had telephoned the mother and advised her that her son was the subject of a police investigation and that the detective needed the mother to bring the respondent to that office. When they arrived, the detective introduced herself and directed the respondent and his mother to a nearby waiting area within the confines of the Child Abuse Squad’s main office. In addition to the waiting area, the squad’s main office included approximately 20 desks, a conference room, a “juvenile” room, a separate interrogation room and a holding cell. At that date and time, no one else was present in the waiting area to which the respondent and his mother were directed. They remained in the waiting area for about 15 minutes, during which time the respondent was not placed in handcuffs. The detective did not offer the respondent food, drink or use of bathroom facilities, and the respondent did not request same.
At that point, the detective took the respondent’s mother into the “interrogation” room, explaining to her “what the investigation was about,” with no further details being elicited during the testimony, and asked her permission to question the respondent. At about 6:20 p.m., the detective brought the respondent and his mother to the “juvenile” room, which was in conclusory testimony called the “designated” juvenile room, with no additional testimony offered with respect to that designation. The juvenile room, as the detective described it, contained one desk and three chairs, was illuminated by artificial lighting, and had a “comfortable” room temperature. In proceeding to the juvenile room, the respondent did not pass the holding cell. No other police personnel were present in the room.
The detective then administered the Miranda warnings to both the respondent and his mother, doing so at a slow speed *467 and with appropriate inflection (as the detective simulated while testifying). The respondent and his mother each indicated their respective understanding of each warning as administered, both verbally and in writing. The detective’s administration of the warnings concluded at approximately 6:35 p.m. During that administration, the detective again did not offer the respondent food, drink or use of bathroom facilities, and the respondent again made no request for same. Neither the respondent nor his mother ever indicated that they did not wish the respondent to speak with the detective, and ultimately, the detective, the respondent and his mother all signed the Miranda warning sheet.
At this point, the detective asked the mother if it was all right for her to speak with the respondent alone. The detective explained that she made this request because children are often intimidated speaking in front of a parent, but are less intimidated speaking to the police alone. The mother responded affirmatively and left the room. The respondent said nothing as this was taking place. The detective then spoke to the respondent alone, explaining to him why he was there: he was accused of having a little girl touch him while riding on a school bus. After the respondent initially denied these allegations, the detective indicated to him that there were witnesses to the event that saw him. The respondent then proffered the verbal admission that is the subject of this pretrial suppression hearing.
The detective had questioned the respondent for about 20 minutes at this point, and then asked if he was willing to put his statement in writing. When he answered affirmatively, the detective provided him with a pad and a pen and left him alone in the room, as she returned to her own desk outside. The respondent remained alone in the juvenile room for approximately 30 minutes writing out his statement. No police personnel were in the juvenile room, and his mother remained outside in the waiting area, never indicating to the detective that she wished to reenter the juvenile room. When the detective checked in on the respondent, he indicated he was finished and handed his written statement to the detective. After taking possession of the written statement, the detective left the room to continue processing paperwork. At this point, the respondent began banging on the door and crying, indicating he was claustrophobic. This was the first time that evening that the respondent cried. The detective left open the door to the room and let the mother back in. The detective subsequently advised the mother that the respondent had admitted to the allegations, and placed him *468 under arrest. At no point in the entire process did the respondent or his mother indicate a desire to have an attorney present, and the detective neither threatened nor made any promises to the respondent or his mother. From these facts, the court draws the following conclusions of law:
The presentment agency preliminarily concedes that the respondent was in police custody when making both his oral and his written statements. The court further finds that the police questioning at issue constituted custodial interrogation. This, in turn triggered all procedural statutory safeguards and those developed in case law. Family Court Act § 305.2 (7) mandates that the police administer the Miranda warnings to both the juvenile detainee and the parent or guardian, if that person is present. This respondent’s mother was indeed present, and the court finds that the warnings were indeed properly and sufficiently administered to both individuals. (See Matter of Robert R, 177 AD2d 857 [3d Dept 1991].)
Family Court Act § 305.2 (4) (b) further requires that any custodial interrogation only take place in a facility designated as suitable for such purpose by the Chief Administrator of the Courts. While the police detective’s testimony was conclusory concerning her use of the “designated” juvenile room, it is well settled by appellate case law that the applicable standard in assessing the suitability of the room used for interrogation is that of substantial compliance. (Matter of Emilio M., 37 NY2d 173 [1975]; Matter of Rafael S., 16 AD3d 246 [1st Dept 2005]; Matter of Bree J., 183 AD2d 675 [1st Dept 1992]; Matter of Luis N., 112 AD2d 86 [1st Dept 1985]; see also Matter of Donta J., 35 AD3d 740 [2d Dept 2006].) In view of the testimony describing the room that was used in the instant matter, the court finds that, at the very minimum, the police substantially complied with Family Court Act § 305.2 (4) (b). (See also Uniform Rules for Family Ct [22 NYCRR] § 205.20.)
The analysis now turns to the key issue in this case: the police questioning of the 10-year-old respondent alone while his mother was elsewhere in the police precinct. The court notes that the Family Court Act does not require the presence of a parent before the police may interrogate a youthful suspect in their custody. Indeed, the statute clearly contemplates the police conducting such interrogation in the absence of a parent/ guardian, under certain circumstances. (See Family Ct Act § 305.2 [7], [8].) The issue before this court is whether this was permissible under the facts presented here, to wit: when the po *469 lice asked the mother, who was both present and properly administered the Miranda warnings, if it was all right for the detective to speak with the respondent alone.
Courts have long recognized the importance, in various contexts, of parental presence at police questioning of youthful detainees, even those who have attained “adult” status in the eyes of the criminal law. Indeed, in 1965, the New York State Court of Appeals acknowledged that, even when the police interrogate a full-fledged adult and refuse access to him/her by family members, “this fact would be germane on the issue of . . . . [the] voluntary nature [of the detainee’s subsequent statement to the police].” (People v Taylor, 16 NY2d 1038, 1040 [1965].) Forty years later, the Second Department considered the presence of a parent as relevant to the issue of custody. (Matter of Victor V., 30 AD3d 430 [2006].)
In the interim, the Second Department recognized that the “emotional and intellectual immaturity of [a 15-year-old youth] . . . creates an obvious need for the advice of a guardian ... at an interrogation.” (Matter of Michelet P., 70 AD2d 68, 71 [1979]; People v Ward, supra.) This sentiment was codified by the New York State Legislature, when it specifically listed the detainee’s age and the presence or absence of a parent/guardian among the relevant factors in determining the suitability of police questioning of juveniles. (Family Ct Act § 305.2 [8].) In interpreting the statute in the context of the “greater care” standard set forth in People v Ward (supra), the Second Department found that when the police separated a seven-year-old detainee from his mother and interrogated him, they “failed to comply with these [greater care] requirements.” (Matter of Julian B., 125 AD2d 666, 669 [1986].) Later that year, it reiterated that “[t]his court has repeatedly stated that the law will not tolerate police conduct aimed at isolating a youthful suspect from his family or other supportive adults.” (People v Hall, 125 AD2d 698, 701 [1986].) Thus, the state of the law on this issue, circa 1986.
In the ensuing 26 years, however, what appeared at the time to be rather well-settled law moved in a somewhat different direction. Appellate analysis honed in on this as an access-to-counsel issue. Less than a year later, the Second Department approved of a 16-year-old detainee being questioned alone, relying on the fact that it was done with his father’s consent. The Court approved this solo interrogation, since there was no “ ‘evidence that the police intentionally deprived the defendant of access to his family in an effort to bar his exercise of his right to *470 counsel.’ ” (People v Price, 128 AD2d 560, 560 [2d Dept 1987] [emphasis added], quoting People v Fuschino, 59 NY2d 91, 100 [1983]; see also People v Green, 147 AD2d 955 [4th Dept 1989].) This would become a recurring theme.
The Price analysis for a 16-year-old defendant was extended to a 13-year-old respondent in Family Court 20 years later, when the young detainee’s mother, after being properly administered the Miranda warnings along with her son, gave a police detective permission to interview her son outside of her presence (and there was no evidence that he asked that his mother be present while he was questioned). Finding that “[t]he evidence does not suggest that the detectives engaged in a ‘seemingly conscious scheme to isolate the [detainee] from his mother in an apparent effort to bar his free exercise of the right to counsel,’ ” the Court upheld the admissibility of his subsequent confession. (Matter of Jimmy D., 63 AD3d 737, 737 [2d Dept 2009] [emphasis added], quoting People v Butler, 112 AD2d 1006, 1007 [2d Dept 1985].)
When this case reached the Court of Appeals, the admissibility of the statement was again confirmed. (Matter of Jimmy D., 15 NY3d 417 [2010].) The facts considered by the Court of Appeals share some similarities with those in the case at bar. Both cases involved allegations of a sexual nature. In both cases, the respondent was brought to a female detective by his mother. Each mother then agreed that her son be questioned alone by the detective. Each detective explained that children sometimes do not feel comfortable talking to a detective in front of a parent, or words to that effect.
Yet significant differences also exist. The respondent in Jimmy D. was 13 years of age; the present respondent was 10 years old at the time of the questioning. In Jimmy D., the respondent and his mother had an opportunity to talk while together in the waiting room; this record is silent as to whether there was any conversation between the respondent and his mother in the waiting area. Of greatest import, the respondent in Jimmy D. agreed to his being questioned outside his mother’s presence; the present respondent was not even asked if he agreed.
The Court of Appeals first focused on precedent that examined whether a police detainee’s separation from his/her family violated the detainee’s right to counsel. It reviewed a line of cases that involved older teenagers (over the age of 16 but not older than 18) that essentially equated deliberate isolation by the police of the detainee from family members with effective *471 denial of the detainee’s potential access to an attorney. (People v Bevilacqua, 45 NY2d 508 [1978]; People v Townsend, 33 NY2d 37 [1973]; People v Kern, 149 AD2d 187 [2d Dept 1989], affd 75 NY2d 638 [1990]; People v Ventiquattro, 138 AD2d 925 [4th Dept 1988].) In upholding the Second Department’s determination that the respondent’s statement was voluntarily made in Jimmy D., the Court apparently found no such violation under the facts of that case.
The Court moved next to a review of a parent’s rights in the context of custodial interrogation of minor children, noting first that “the parent must not be denied ‘an opportunity to attend [the] custodial interrogation.’ ” (15 NY3d at 422, quoting People v Mitchell, 2 NY3d 272, 275 n 11 [2004].) In dicta, the Court proceeded to add some salient comments about what it regarded as “the better practice”: first, the police officer “is to inform the parent that the parent may attend the interview if he or she wishes”; second, “[i]f a parent is asked to leave, the parent should be made aware that he or she is not required to leave.” (15 NY3d at 422.) The Court went on to note the advantages of having a parent present during custodial interrogation.
The Court of Appeals’ ensuing statutory analysis of Family Court Act § 305.2 accurately noted that it “expressly contemplates the possibility that the police may be unable to contact the parent of a child in custody,” concluding that “[n]either the Family Court Act nor our precedent interpreting that statute give a child under 16 years the absolute right to the presence of a parent during interrogation.” (15 NY3d at 422-423.) The Court relied on this analysis, as well as other significant factors, in reaching its decision. Among those factors the Court considered to support its finding of voluntariness were: the respondent and his mother had the opportunity to talk while in the waiting area; both the respondent and his mother agreed to his being questioned alone; there was no evidence that the respondent asked for her during that questioning; and the respondent’s whereabouts were not concealed from his mother.
In assessing the facts of the case at bar in the context of Jimmy D., this court is, of course, bound to follow its holding if those facts are sufficiently similar to the facts and analysis of the Court of Appeals precedent. For the reasons set forth below, this court finds that Jimmy D. is not controlling because the instant case presents significant facts that sufficiently differ. First, while dicta is not precedent, per se, the simple fact remains that the “better practice” set forth in Jimmy D. was *472 simply not followed here. The detective did not specifically advise the respondent’s mother that she could attend the questioning if she wished to do so. When she was asked to leave the juvenile room, she was not made aware that she was not required to leave.
Three additional facts require a different result here. The respondent at bar did not agree to be questioned alone; indeed, he was not even asked his position regarding being questioned outside his mother’s presence. Analogously, the discretion to waive the Miranda rights has been held to be personal to the juvenile in question. A parent/guardian cannot waive those rights on behalf of the youth. (Matter of Hector G., 89 Misc 2d 1081 [Fam Ct, NY County 1977]; Matter of Joseph S., 62 Misc 2d 329 [Fam Ct, NY County 1969]; Matter of Knox, 53 Misc 2d 889 [Fam Ct, Monroe County 1967].) Arguably, and consistently, it appears to follow that the right to waive the presence of a parent — already present — at a custodial interrogation is also personal to the juvenile, requiring the youth’s assent, as happened in Jimmy D.
Next, the respondent in Jimmy D. was 13 years of age. The respondent before this court was 10 years old at the time of the custodial interrogation. As the Court stated in Jimmy D., “juveniles charged with delinquency may not fully ‘understand the scope of their rights and how to protect their own interests.’ ” (15 NY3d at 422, quoting Mitchell, 2 NY3d at 275.) If this is true of a 13 year old, it is of far greater import when the subject of the police questioning is only 10 years old. This court need not belabor the obviously different levels of maturity between a seventh grader and a fourth grader.
The final salient factual distinction concerns the opportunity for the youthful detainee and the parent to consult. As the Second Department observed, in Matter of Michelet P. (supra): “[t]he emotional and intellectual immaturity of [the] juvenile creates an obvious need for the advice of a guardian ... at an interrogation from which charges of juvenile delinquency may ensue.” (70 AD2d at 71 [emphasis added].) In Jimmy D. (supra), the Court of Appeals also noted that “juveniles charged with delinquency may not fully ‘understand the scope of their rights and how to protect their own interests,’ ” quoting its earlier language in Mitchell (supra). (15 NY3d at 422.)
How is a parent/guardian to provide meaningful “advice” to a youth who “may not fully ‘understand the scope of [his/her] rights’ ”? It appears that this may be effectively provided only *473 when the detainee and parent are provided with an opportunity to consult, most logically between the administration of the Miranda warnings and the commencement of the questioning. In the case at bar, quite the opposite took place. Upon completing the warnings, the detective asked the mother to leave, providing no opportunity for the respondent to even engage in a conversation with her before she did so. From a record that is completely silent as to this, this court cannot conclude that the respondent spoke at all with his mother while they sat in the waiting area of the police precinct.
While Family Court Act § 305.2 clearly stops short of requiring the presence of a parent/guardian as a mandatory precondition to custodial interrogation of a youthful suspect by the police, when considered in its entirety, it does set forth an unambiguous preference for such a parental presence with equal clarity. Under its dictates, this court must take into account the detainee’s age and the presence or absence of a parent/guardian among the relevant factors in determining the suitability of the police questioning of this respondent. (Family Ct Act § 305.2 [8].)
Since the respondent was just 10 years of age at the time of the interrogation, and since his mother, while present for the administration of the Miranda warnings, was asked to leave the juvenile room almost immediately thereafter, with no opportunity afforded to the respondent to either consult with his mother before she left, or to assent to her departure, and consistent with the overarching “greater care” standard, this court cannot conclude that his subsequent admissions were knowingly, intelligently and voluntarily made. For all of the foregoing reasons, the application to suppress both the oral and written admissions is granted.
It is therefore ordered, that the respondent’s motion is granted.