■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v ROQUE SILVAGNOLI, Appellant. [57 NYS3d 127]—

Judgment, Supreme Court, New York County (Renee A. White, J. at suppression hearing; Rena K. Uviller, J. at plea and sentencing), rendered November 20, 2012, convicting defendant, upon his plea of guilty, of manslaughter in the first degree, and sentencing him to a term of 18 years, reversed, on the law, the motion to suppress defendant's statements granted, the plea vacated, and the matter remanded for further proceedings.

Even where two criminal matters themselves are not related, police may not question a suspect on one matter on which he or she is represented by counsel "in a manner designed to elicit statements on an unrelated matter" in which the suspect is not represented (*People v Cohen*, 90 NY2d 632, 641 [1997] [internal quotation marks omitted]). The key inquiry is whether the "impermissible questioning . . . was not discrete or fairly separable" (*id.* [internal quotation marks omitted]).

Here, the detective who questioned defendant in a homicide investigation acknowledged that during the questioning a "conversation came up" in which he told defendant that he knew about a pending drug case against defendant in which he knew defendant was represented by counsel. Specifically, the detective recounted telling defendant that "you could say nothing, but that was kind of a dumb thing you did selling drugs to an undercover back in 2007," and asking if he was so smart why he had sold drugs to an undercover officer.

Although the reference to the drug charges on which defendant was represented was brief and flippant, it was not, in context, innocuous or discrete and fairly separable from the homicide investigation. The detective told defendant during the questioning that he knew defendant was involved in selling drugs at the location of the murder and that the killing was over a drug debt. The remarks regarding the pending drug case went to defendant's alleged participation in the drug trade at the location of the homicide, the very activity out of which a motivation for killing the victim arose. Indeed, it succeeded in eliciting from defendant a response that may fairly be interpreted as incriminating himself in dealing drugs at the location, the alleged motivation and context out of which the homi-

cide occurred. Accordingly, because questioning regarding the drug case on which defendant was represented by counsel was intertwined with questioning regarding the homicide, defendant's statements should have been suppressed.

However, we find no other basis for suppression. As the dissent notes, the repeated comments made to defendant by the detective and his colleagues to the effect that defendant should "tell [his] side of the story" immediately because if he were to wait until trial, "[no] one is going to believe" him and he would be "charged with murder, not . . . manslaughter" did not vitiate the *Miranda* warnings defendant had received (*Matter of Jimmy D.*, 15 NY3d 417 [2010]). Concur—Moskowitz, Gische and Kahn, JJ.

Sweeny, J.P., and Mazzarelli, J., dissent in a memorandum by Mazzarelli, J., as follows: Over two and one-half years after the homicide for which defendant was ultimately convicted, he was arrested for an unrelated crime. Detective Eric Ocasio, the lead investigator in connection with the homicide, who suspected defendant of being its perpetrator, took custody of him after the arrest, and, after reading defendant his *Miranda* rights, which defendant waived, questioned him at the 9th precinct stationhouse over the course of three and one-half hours. At the end of the interrogation, defendant confessed to shooting the victim, who he stated was a customer of his drug-dealing business in and around the Campos Plaza projects. According to the written statement, defendant came upon the victim at the projects, and reminded him of a $220 drug debt owed by the victim to defendant. The victim gave him $20, spit in his face and assaulted him. Defendant went up to his girlfriend's apartment and then came back down, where he saw the victim holding a knife. Defendant retrieved a gun that he knew to be hidden in a nearby garbage can. The victim walked towards him holding the knife and threatened to use it if defendant did not shoot him first. Defendant stated that he squeezed the trigger, not expecting the gun to fire since he had tested it previously and it hadn't worked. It did, however, and the victim fled.

Defendant moved to suppress the statement. At the suppression hearing, Detective Ocasio testified that defendant was in a gang or crew known as the Money Boys that hung out around Campos Plaza, and that multiple people had identified him as the shooter. Ocasio also learned from a witness or witnesses that defendant and his crew fled from the scene immediately after the shooting. Ocasio was unable to locate defendant, who had another criminal case from 2007 pending against him for

allegedly selling cocaine to an undercover police officer about five months before the shooting at the same location. On April 30, 2008, Ocasio went to Supreme Court, where defendant had a scheduled court appearance in the 2007 drug case, hoping that defendant would show up. Although defendant's lawyer on that case was present, defendant was not.

Ocasio described the interrogation as taking place over three discrete sessions, beginning around 4:00 p.m. and marked by breaks that took place at about 5:30 p.m. and again sometime between 7:00 and 7:30 p.m., until defendant gave his statement. During the first session Detective Ocasio elicited general background information about defendant to relax him and build a mutual rapport. During the next session, Ocasio confronted defendant with evidence compiled against him and charges that could be brought. Ocasio told defendant that several people had identified him as the perpetrator of the homicide, showing him the photo array from which defendant had been identified. Ocasio also showed defendant pictures of the victim and falsely told defendant that the victim had gurgled defendant's name before dying. Ocasio further told defendant that his cell phone had been traced to a cell tower in the area.

Nevertheless, defendant repeatedly denied killing the victim and said words to the effect of "I got nothing to say about this. I've told you what I've got to say." However, Ocasio denied under cross-examination by defendant's counsel that defendant ever said, "I've answered your questions, but now I'm done talking."

Ocasio told defendant during the second session of the interrogation that he knew defendant was involved in drug dealing at Campos Plaza. Ocasio testified that the subject of drug dealing at Campos Plaza came up "numerous times," that he told defendant that he knew the Money Boys were selling crack, the victim was a drug user, and the killing was over a $20 drug debt. Further, Ocasio acknowledged that a "conversation came up" in which he told defendant that he knew about the pending case in Supreme Court, and that he had told defendant that "you could say nothing, but that was kind of a dumb thing you did selling drugs to an undercover back in 2007," to which defendant responded, in sum and substance, "[T]hat was just drugs. I'm talking about drugs, right. I didn't have anything to do with this murder."

Although he could not recall every word and the precise phrases he used, Ocasio "several times" told defendant that it would be a good idea to explain what happened. He told defendant that the only issue was why he had done it, he could

clear up his side of the story, and everyone does stupid things when they are young but what is really stupid "is if you've got nothing to say about what you've done." He further asked whether defendant was acting in self-defense and told him that if he was or if he did not intend to kill the victim, manslaughter, rather than a murder charge carrying a 25-year to life sentence, was a possibility, although he made no promise that defendant would get manslaughter. Toward the end of the second session Ocasio told defendant that he was going to be charged with murder, and "it's up to you to say your side of the story . . . And I said if you went to a courtroom and you're not going to say nothing, that's up to you." He also asked defendant words to the effect of "How you think it's going to look if you go to trial, you got no statement, you get up on the witness stand and then for the first time you try to convince a jury of what happened? No one is going to believe you if you wait until then to do it."

Detective Ocasio gave defendant a second break, during which he left the interrogation room to get defendant a meal. Ocasio left some photos of the crime scene and the victim on the table and told defendant to "basically think about it." He returned about 10 to 20 minutes later with another detective and discussed the case with defendant for another 10 to 15 minutes, reiterating that defendant was going to be arrested and charged with murder, "and that if he had to say something now would be the time." Ocasio and his colleague stepped back out for a brief moment so Ocasio could use the restroom, and when they again returned, he saw that a photo of the victim had been placed face down on the table and defendant said, "I'll tell you how it happened." Defendant then gave an oral statement, signed the written statement described above and, later that evening, after again being advised of and waiving his *Miranda* rights, recorded a video statement.

Finding that the People's witnesses testified in a forthright and credible manner, Supreme Court concluded that defendant's statements were not improperly elicited and denied his motion to suppress. The court characterized Ocasio's reference to the pending case arising out of defendant's sale of drugs to an undercover officer, for which defendant was represented by counsel, as a "flippant comment" that "was part of his interrogation strategy," but concluded that "there was nothing untoward" in it. The court noted that, although "the crimes occurred within the same geographical area and are, generally, drug-related," they were not intertwined, since Ocasio "did not ask defendant questions regarding his pending matter nor was

the open drug case the focus of the interrogation." Accordingly, any incriminating response would have involved the separate drug case.

The court further held that defendant's statements to the effect that he had "nothing to say" when denying committing the crime was not an unequivocal invocation of his right to remain silent that negated the effect of his prior waiver of *Miranda*. Further, Ocasio did not mislead defendant regarding his right to remain silent but merely told him that a jury would find any explanation more credible if he did not give it for the first time at trial. Thereafter, defendant pleaded guilty to manslaughter in the first degree in full satisfaction of the indictment and was sentenced to a prison term of 18 years with five years of post-release supervision.

Defendant argues on appeal that his right to counsel was violated when Detective Ocasio questioned him on a prior drug offense, for which charges were pending and for which Ocasio knew he was represented by counsel, in an effort, as alleged by defendant, to leverage those charges into an admission of guilt for the homicide. The leading case on which defendant bases this argument is *People v Cohen* (90 NY2d 632 [1997]). In that case, police took the defendant into custody after recovering a weapon that had been stolen from a garage during a burglary, and that was later used during the robbery of a convenience store in which a clerk was shot to death. The detectives who conducted an interrogation of the defendant a few days after the homicide were aware that the defendant was already a suspect in the garage burglary and that he was represented by counsel in connection with that investigation. In fact, counsel had specifically warned the detectives not to question the defendant in connection with the burglary. Nevertheless, throughout the interrogation, the detectives interspersed questions about the burglary with questions about the subsequent robbery and homicide, resulting in the defendant's confession to the latter crimes.

In suppressing the statement, the Court of Appeals identified three separate categories of instances where questioning about a matter for which the defendant has retained counsel is intermingled with questioning about a separate matter for which there is no representation. In the first, "the two criminal matters are so closely related transactionally, or in space or time, that questioning on the unrepresented matter would all but inevitably elicit incriminating responses regarding the matter in which there had been an entry of counsel" (90 NY2d at 638). The second category involves "interrogations concern-

ing crimes less intimately connected, but where the police were aware that the defendant was actually represented by an attorney in one of the matters" (*id.* at 640). A third category involves questioning of a suspect who is in custody with respect to a matter for which he or she is represented by counsel (*id.*).

In cases falling under the first and third categories, no questioning may be conducted with respect to even the unrepresented matter (*id.* at 638-639). In *Cohen*, the Court found that the police questioning implicated the second category. Applying precedent, particularly *People v Ermo* (47 NY2d 863 [1979]), the Court observed that questioning on a represented matter is permissible, so long as it is "discrete or fairly separable" from, and not "so interrelated and intertwined with," the questioning on the other matter (*Cohen* at 641 [internal quotation marks omitted]). Further, it is "critical" to a finding that questioning was impermissible "that the police purposely 'exploited concededly impermissible questioning' in order to obtain a confession in the unrepresented matter" (*id.* [emphasis omitted], quoting *Ermo*, 47 NY2d at 865). The Court found that the questioning of the defendant was improper because, despite their knowledge that the defendant was represented in connection with the investigation into the garage burglary, they deliberately joined it with the homicide in an effort to exploit the former crime and "engaged in their most forceful and heated questioning in connection" with the represented crime (*id.* at 642). As the Court stated, "Unquestionably, their pointed questioning on the garage crimes, impliedly signifying knowledge of the damning connection between that matter and the . . . homicide, was designed to add pressure on defendant to confess" (*id.*).

The questioning in this case also falls under the second category identified in *Cohen*. However, I disagree with the majority's conclusion that it rises to the standard set forth in that case. First, while Detective Ocasio testified that he discussed "drug dealing at Campos" with defendant numerous times, there is no basis in the record to conclude that Ocasio brought up the actual crime for which defendant was arrested more than once. To the extent that Ocasio explored in more general terms a possible drug-selling relationship between defendant as seller and the victim as the buyer, it is clear from the record that this was an effort to signal to defendant that he knew defendant had a motive to shoot the victim. This strategy in no way depended on Ocasio's emphasizing the drug transaction between defendant and an undercover officer. Accordingly, I

agree with the hearing court's characterization of the reference to the represented matter as a "single, flippant, comment."

That being the case, the questioning about the charged crime could not have been "completely interrelated and intertwined and not discrete or fairly separable" from the questioning about the homicide (*Cohen*, 90 NY2d at 642 [citations and internal quotation marks omitted]). Further, because the statement was so isolated, it could not have comprised a strategy "designed to add pressure on defendant to confess" (*id.* at 642). In contrast to *Cohen*, in which the detectives clearly tried to link the burglary, which resulted in the theft of the gun, and the robbery in which that very gun was used to kill a clerk, there is no linkage between the undercover sale and the homicide, such that Ocasio could be said to have had a purposeful strategy in mentioning the sale.

I agree with the majority to the extent it concludes that defendant's *Miranda* warnings were not vitiated when Detective Ocasio advised defendant to tell his side of the story to him lest he not be believed when he told it for the first time to the jury. *People v Dunbar* (24 NY3d 304 [2014], *cert denied* 575 US —, 135 S Ct 2052 [2015]), on which defendant relies, dealt with an improper, scripted statement *prior to* the issuance of *Miranda* warnings that directly undermined those warnings by encouraging the defendant to take advantage of what would be his only opportunity to speak before he went to court. Here, Ocasio never suggested to defendant that it would behoove him to speak rather than remain silent. Indeed, defendant had already waived his right to remain silent and instead adamantly denied that he was involved in the homicide. Ocasio's statements merely indicated that this full-throated denial would reflect poorly on defendant's overall credibility at trial if he adopted a trial strategy of admitting his involvement but seeking to excuse it because of the need to defend himself against the victim's advance with a knife. In my opinion, there was nothing improper about that. Further, as held in *Matter of Jimmy D.* (15 NY3d 417 [2010]), it is a "novel theory" that waiver of properly administered *Miranda* warnings may subsequently be vitiated by misleading representations about the right to counsel during the course of the interrogation (15 NY3d at 424).

Finally, although the majority does not reach it, I disagree with defendant's argument that he effectively retracted his *Miranda* waiver when he said words to the effect of "I've told you what I've got to say." After *Miranda* warnings have been administered and a suspect agrees to talk to police, any

subsequent invocation of the right to remain silent and for questioning to cease must be "unequivocal" (*People v Barrios*, 259 AD2d 407, 407 [1st Dept 1999], *lv denied* 93 NY2d 966 [1999]). Here, read in its proper context, defendant's statement, as Ocasio related it, was merely intended to reiterate that he denied killing the victim. In no way did it convey the message that he was invoking his right to remain silent and that Ocasio should stop questioning him (*see People v Cole*, 59 AD3d 302, 302 [1st Dept 2009], *lv denied* 12 NY3d 924 [2009] ["I have nothing to say to you" was not unequivocal invocation of the defendant's right to cut off questioning "when viewed in the context of defendant's full statement denying involvement in the robberies"]; *People v Lowin*, 36 AD3d 1153, 1155 [3d Dept 2007], *lv denied* 9 NY3d 847 [2007] [the defendant's statement "I'm done talking, okay, because that's what happened" merely reflected the defendant's unwillingness to change his story]). It bears repeating that Ocasio explicitly denied that defendant had stated that he had answered all of the detective's questions and was done talking.

For the foregoing reasons, I would affirm the judgment of conviction.