Matter of Luis P. (2018 NY Slip Op 02564)





Matter of Luis P.


2018 NY Slip Op 02564


Decided on April 12, 2018


Appellate Division, First Department


Singh, J., J.



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on April 12, 2018
SUPREME COURT, APPELLATE DIVISION
First Judicial Department

Rolando Acosta,P.J.
Peter Tom
Troy K. Webber
Ellen Gesmer
Anil C. Singh, JJ.


5001 

[*1]In re Luis P., A Person Alleged to be a Juvenile Delinquent, Appellant. Presentment Agency



Luis P. appeals from the order of disposition of the Family Court, Bronx County (Sarah P. Cooper, J.), entered on or about February 9, 2016, which adjudicated him a juvenile delinquent upon a fact-finding determination that he committed acts that, if committed by an adult, would constitute the crimes of criminal sexual act in the first degree (two counts), sexual abuse in the first degree (two counts), sexual misconduct (two counts), and endangering the welfare of a child, and placing him on probation for a specified period.




Tamara A. Steckler, The Legal Aid Society, New York (Raymond E. Rogers of counsel), for appellant.
Zachary W. Carter, Corporation Counsel, New York (Janet L. Zaleon of counsel), for presentment agency.



SINGH, J.


The primary issue on this appeal is whether the presentment agency adequately proved beyond a reasonable doubt that appellant's oral and written statements were voluntary. We find that the presentment agency met its burden of proving the voluntariness of appellant's oral and written statements, and therefore affirm the order of disposition adjudicating him a juvenile delinquent.
As a preliminary matter, Family Court's factual findings are based in part on credibility determinations that are entitled to deference (see People v Prochilo, 41 NY2d 759, 761 [1977]; Matter of Cy R., 43 AD3d 267, 268 [1st Dept 2008], lv denied 9 NY3d 814 [2007], cert denied [*2]552 US 1320 [2008]). Where the court "carefully considered the relevant circumstances, including demeanor," this Court will not disturb these credibility determinations (Matter of Michael S., 303 AD2d 170, 171 [1st Dept 2003]; see Matter of Alberto R., 84 AD3d 593 [1st Dept 2011]). After reviewing the record [FN1], we present the facts as determined by Family Court and find no basis to disturb these findings.
From July 16th to July 30th 2014, L.F. visited his father, Joshua M. in his apartment complex in the Bronx. L.F. lives with his mother, Cynthia M. Joshua M. lives in the same apartment complex as his girlfriend, Lizbeth S., who also has a son, the appellant in this case. At the time of the complained-of incident, L.F. was 9 years old and appellant was 13 years old. Appellant did not live with his mother because as a child, he was sexually abused by his brother. In May 2014, the Administration for Children's Services placed appellant in the care of his grandmother after the Family Court made a finding of child neglect against Lizbeth for failing to protect appellant from his brother.
During most of this visit, L.F. stayed with his grandmother on the second floor of the apartment complex. However, one night - all parties are unclear as to which specific night - L.F. stayed in Lizbeth's apartment with Joshua M. and appellant. Appellant and L.F. stayed in one room with bunk beds and Joshua M. and Lizbeth stayed in the other bedroom. Around noon on the day in question, appellant entered the room where L.F. was sleeping on his stomach.
Appellant pulled down L.F.'s pants and placed his "peanuts" in L.F.'s mouth and anus. L.F. explained that "peanuts" are something used to "[p]ee in the bathroom." When appellant put his penis in L.F.'s anus, he moved up and down while he pulled L.F.'s shoulders so that L.F. simultaneously moved up and down. Appellant then stopped and turned L.F. around, so that his back was on the mattress. He then put his penis in L.F.'s mouth while using his hands to move L.F.'s head up and down. After the incident, appellant did not speak, and he left the room.
Three days after returning from this visit, L.F. told his mother that appellant had "raped [him]." L.F. had used this specific language after watching several episodes of Law & Order. After this revelation, Cynthia took L.F. to the Children's Hospital at Montefiore Medical Center and was referred to the Butler Child Advocacy Center (CAC) by his primary care physician. The Montefiore records contain nearly the same accusations as earlier described.
At CAC, Dr. Linda Cahill performed a physical examination that revealed only a small internal anal fissure, which is a finding not specific to sexual abuse. L.F. was also tested for sexually transmitted diseases, with negative results.
At some time prior to September 25, 2014, Lizbeth agreed to bring appellant to the Bronx Special Victims Unit office to speak with New York City Police Detective James Barrenger. On September 25, 2014, appellant and his grandmother, who was appellant's legal guardian, arrived at the precinct. When Lizbeth arrived at the precinct, appellant and Lizbeth were informed by Detective Barrenger that they were going to be interviewed and were escorted to the juvenile interrogation room. Once in the interrogation room, Detective Barrenger recited the simplified Miranda warnings to both appellant and Lizbeth that the NYPD specifically uses for juveniles [FN2]. [*3]After reading each warning, Detective Barrenger asked if they understood and after hearing their affirmative statements, he would write down "yes" after each warning. Detective Barrenger then asked, "[N]ow that I have advised you of your rights, are you willing to answer questions." Both appellant and his mother responded, "Yes," at which point appellant, Lizbeth and Detective Barrenger all signed the bottom of the form. During this time, neither appellant nor his mother asked Detective Barrenger any questions, asked to stop or requested a lawyer.
Detective Barrenger then informed appellant and Lizbeth that he was there to speak about the incident with L.F.. At this point, appellant stated that he did not want to talk about the incident with his mother present. The detective asked Lizbeth "if she was all right with that, if she wanted to leave the room. She said she was okay with it. She complied and she left the room." Detective Barrenger did not suggest that Lizbeth should leave the room and would have preferred if she had stayed.
After Lizbeth left the room, Detective Barrenger asked appellant to explain the incident between him and L.F.. Appellant responded that he put his "peanuts" inside L.F.'s mouth and "butt." Detective Barrenger asked appellant what he meant by "peanuts" and after some discussion, appellant admitted that he meant his penis. Appellant was then asked by Detective Barrenger if he would like to write an apology letter to L.F. apologizing for what had happened. Appellant responded that he would like to write the apology letter. At no point did Detective Barrenger tell appellant that this letter would be used in court against him. Detective Barrenger gave appellant a pen and paper, told him to write the letter in his own words and left the room [*4]while appellant wrote the letter.[FN3]
When appellant appeared to be finished, Detective Barrenger reentered the room and read the letter out loud with appellant. Detective Barrenger gave appellant an opportunity to make changes or corrections. Appellant had already crossed out words and did not make any other changes. In all, the Miranda warning and waiver, and appellant's oral and written statements lasted about 15 to 20 minutes. During the interview, appellant was not handcuffed and Detective Barrenger was in business attire and was unarmed. Detective Barrenger did not make any promises or threats to induce appellant to write the letter, and did not tell appellant or imply that he would be allowed to go home if he wrote the letter. After Lizbeth left the room, appellant never asked Detective Barrenger to stop the interview or have his mother return to the room, and never asked for a lawyer.
On December 10, 2014, the Corporation Counsel of the City of New York filed a designated felony act petition in Bronx County Family Court. The petition charged appellant, who was 13-years-old at the time, with the commission of acts that, if done by an adult, would constitute the crimes of criminal sexual act in the first degree (two counts), sexual abuse in the first degree (two counts), sexual misconduct (two counts), and endangering the welfare of a child. Attached to this petition was a supporting deposition from L.F. and Detective Barrenger alleging that appellant put his "peanuts" in L.F.'s mouth and anus. Additionally, attached to the petition was appellant's apology letter to L.F.
A Huntley hearing was conducted on February 5, 2015. At the hearing, appellant's grandmother, Julia C., testified that she brought appellant to the police station on September 25, 2015, she met Lizbeth at the station, and that when Detective Barrenger arrived, he escorted appellant and Lizbeth, leaving her in the lobby. A short time later, Lizbeth rejoined her, and appellant and Detective Barrenger were alone in the room for about 15 minutes.
Appellant testified that when Detective Barrenger read each Miranda warning he did not respond at all because he did not understand any of the warnings being given. He did not tell Detective Barrenger this because he was scared and although he did sign the form, he did not tell Detective Barrenger that he was willing to answer questions. He also testified that his mother did sign the form but left the room when Detective Barrenger asked her to step out. Appellant did [*5]not want Lizbeth to leave the room and he did not say to Detective Barrenger that he would not talk about L.F. in front of his mother. According to appellant, after Lizbeth left the room, he refused to answer any of Detective Barrenger's questions and after the detective accused him of putting his "peanuts" in L.F.'s mouth and anus, appellant told him that the accusation was not true.
Appellant testified that he wrote and signed the apology letter because Detective Barrenger told him that it was what was best for him. Appellant stated that he did not know what an apology letter was and that he just wrote down what the detective said. Appellant also testified that he would not use the word "peanuts" to refer to his penis and instead used the word "[d]ick." Finally, during this time he did not ask for his mother because once the detective asked her to step out, he didn't realize that either his mother or his grandmother could come back in.
During cross-examination, appellant defined essential concepts. For example, appellant acknowledged that the word "silent" means "[t]o be quiet" and "you don't have to say anything to me" means "[d]on't talk." He also agreed that when Detective Barrenger advised him that what he said could be used in court, that meant the detective could tell the judge what he had said. Finally, appellant stated that the detective informed him that a lawyer would be given to him if he could not afford one, and that he could talk to a lawyer before the detective asked him any questions.
Family Court held a Huntley hearing and denied appellant's suppression motion. In doing so, the court credited the testimony of Detective Barrenger and of appellant's grandmother, but rejected appellant's testimony in its entirety as "contradictory and self-serving and incredible." The court concluded that the presentment agency met its burden of proving beyond a reasonable doubt that appellant's statements were made knowingly and voluntarily, and that appellant failed to establish that the statements were made in violation of his rights or that he was unaware of what his rights were. Family Court determined that appellant knowingly and voluntarily waived his Miranda rights, after which he made oral and written statements. The court found appellant's testimony that he wrote down exactly what the detective told him to write as "frankly incredible."
Subsequently, Family Court held a fact-finding hearing, in which L.F., Joshua M., Cynthia M. and Lizbeth all testified for the presentment agency. L.F. testified to the substantially similar facts as stated above. Detective Barrenger was also called to testify about his interview with appellant and Lizbeth. His testimony was substantially similar to that presented during the Huntley hearing.
Lizbeth testified as to the interview with Detective Barrenger. She testified that she did not recognize the contents of the Miranda form, but did recognize her signature. Lizbeth also indicated that appellant did state that he was uncomfortable speaking about the incident with L.F. in front of her but that it was Detective Barrenger who asked her to leave to be able to speak to appellant alone. Lizbeth testified that she did not understand that she had the right to remain in the interrogation room and did not realize that she could act on appellant's behalf because the court had placed appellant with his grandmother, who was outside of the interrogation room. Lizbeth did not recall Detective Barrenger informing her and appellant of the Miranda rights. Family Court found Detective Barrenger's testimony that appellant asked his mother to leave the room more credible than Lizbeth's statement that Detective Barrenger asked her to leave.
Over objections from appellant's counsel, Family Court admitted two sets of redacted medical records. The first concerned L.F.'s August 13, 2014 visit, accompanied by his mother, to Montefiore. There, L.F. told Dr. Sofia Chiocconi that appellant first hid in the bathtub and watched him while he was naked in the bathroom, then later "started molesting him from the back." L.F. described that appellant pulled down his shorts, held his hips and "put his balls on [L.F.'s] butt," causing L.F.'s "belly and butt" to hurt. L.F. reported that he "told him, no," but "I just freeze." Appellant does not raise on appeal the admission of the Montefiore records.
The second set of records were from CAC, where L.F. was referred by his primary care physician. As stated by Dr. Linda Cahill, L.F. was referred to CAC because he had been sexually abused by the 14-year-old son of his father's girlfriend over the course of a few months. Dr. Cahill noted that on September 2, 2014, she had conducted a forensic interview in conjunction with the presentment agency and the SVU during which L.F. had "described what he experienced and it included anal and oral sodomy." Dr. Cahill's examination revealed a "small internal fissure" in the anus, which was "a non-specific finding that can happen with sexual abuse or when a child has a hard bowel movement." Appellant challenges Family Court's decision to admit CAC's records.
In a written decision dated August 19, 2015, Family Court found that the presentment agency had established beyond a reasonable doubt that appellant had committed the criminal acts charged in all seven counts of the petition. The court credited the testimony of the presentment agency's witnesses, including that of Detective Barrenger regarding the circumstances of appellant's confession and his writing of the letter. It determined that appellant had willingly confessed to the charged acts and willingly wrote the letter. The court further found that appellant's confession was "sufficiently corroborated by independent evidence of the crime," and that L.F.'s sworn testimony was consistent with appellant's oral and written confessions and corroborated by other witnesses.
On February 9, 2016, Family Court adjudicated appellant a juvenile delinquent and placed him on level two probation for 18 months. As of the date of this appeal, appellant has completed this period of placement. Appellant challenges Family Court's finding that the presentment agency proved beyond a reasonable doubt that his oral and written confessions to Detective Barrenger were voluntary.
Whether Appellant Voluntarily Waived his Miranda Warnings
Family Court properly determined that appellant received full and effective Miranda warnings, and made a knowing and voluntary waiver of his rights before making his oral confession. When a juvenile is taken into custody by a police officer without a warrant, the Family Court Act guarantees certain fundamental rights. Among these are the right to have a parent or guardian present during a police interrogation, the right to have the parent or legal guardian immediately notified that the child has been taken into custody, and the right to be questioned only after the child and the parent or legal guardian are notified of their Miranda warnings (Family Ct. Act 305.2[3], [7], [8]; see People v Mitchell, 2 NY3d 272, 275 n 11 [2004]).
In practical terms, this means that the parent "should not be discouraged, directly or indirectly," from attending the child's interrogation (Matter of Jimmy D., 15 NY3d 417, 422 [2010]). While a parent may choose not to be present when a child is being interviewed, "the police should always ensure that the parent is aware of the right of access to his or her child during questioning," and if asked to leave, "the parent should be made aware that he or she is not required to leave" (id.).
To be sure, the presence of a parent is important, as a parent may help a child understand Miranda warnings "so that the child can consciously and voluntarily choose whether to waive or to exercise his constitutional rights to remain silent, to have an attorney present at his questioning, and to have an attorney provided for him without charge if he is indigent" (id.). A parent present at questioning also is able to "monitor the interrogation lest the police engage in coercive tactics" (id.).
However, a child does not have an absolute right to the presence of a parent during interrogation, and "it does not follow as a matter of law that a child's confession obtained in the absence of a parent is not voluntary" (id.). The presentment agency must prove beyond a reasonable doubt that the juvenile's statements are voluntarily made based on the totality of the [*6]circumstances (People v Jin Cheng Lin, 26 NY3d 701, 719, 725 [2016]; Jimmy D., 15 NY3d at 423); see also Family Ct. Act § 344.2[2] [a statement is "involuntarily made" if, inter alia, it was obtained by threat of physical force or undue pressure, or in violation of a respondent's constitutional rights]).
Where, a juvenile clearly states that he or she understands each right and gives no indication to the contrary and the statements are made in the presence of a parent, the warnings may be voluntarily waived (Matter of Johnny H., 111 AD3d 576 [1st Dept 2013]; Matter of Lyndell C., 23 AD3d 306 [1st Dept 2005]). A waiver may be valid even if the officer does not read from the juvenile version of the Miranda warnings containing supplemental explanations of the standard phrasings (Matter of Steven F., 127 AD3d 536 [1st Dept 2015], lv denied 26 NY3d 906 [2015]).
We find the holding in Jimmy D. determinative of the issue at hand. In Jimmy D., the Court of Appeals upheld as voluntary the confession of a 13-year-old boy accused of sexually abusing his nine-year-old cousin, even though the boy's mother was not present during the custodial interrogation that resulted in his confession. The detective read juvenile Miranda warnings to both the boy and his mother; after each right, the boy and then his mother responded that they understood; and both the boy and his mother signed the Miranda waivers. The detective asked the mother's permission to speak to the boy alone, explaining that "children sometimes do not feel comfortable talking to a detective in front of a parent" (Jimmy D. at 420). After the boy consented to talk to the detective alone, the mother left the interview room and the boy orally confessed (id. at 420-423). The Court of Appeals held that under these circumstances the statements made by Jimmy were validly waived.
The facts in this case are nearly identical to those in Jimmy D. Detective Barrenger notified appellant's mother that she needed to bring appellant to the precinct. When appellant and his grandmother arrived at the precinct, he and his mother had nearly 15 minutes to discuss why he was brought to the precinct. Detective Barrenger then escorted appellant and his mother to a juvenile interrogation room, which contained a window that looked out into the hallway.
Detective Barrenger left appellant and his mother in the room while he printed out the Miranda warnings. When he returned, Detective Barrenger read the juvenile Miranda warnings to both appellant and his mother, which included supplemental explanations of the standard phrasings. Appellant's mother could have, but decided not to raise any questions or discuss the warnings with appellant before he waived his rights. Appellant and his mother affirmatively responded that they understood each of the warnings and signed the bottom of the page. Moreover, appellant's mother voluntarily left the interrogation room after the Miranda warnings were given at her son's request. Accordingly, Family Court properly held that the presentment agency met its burden of proving the voluntariness of appellant's oral confession.
For the first time on appeal, appellant argues that the fifth Miranda warning given by Detective Barrenger was deficient and nullified the effects of the other warnings. However, this challenge is unpreserved. Where a party fails to "challenge a narrow aspect of the sufficiency of the [Miranda] admonitions given him, at a time when the People would have an evidentiary opportunity to counter his assertion, he may not then be heard to complain on appeal" (People v Tutt, 38 NY2d 1011, 1013 [1976]; see also People v Bartlett, 191 AD2d 574 [2d Dept 1993], lv denied 81 NY2d 1010 [1993] [finding that where a defendant does not raise the issue of whether certain Miranda warnings were improper at the trial court, the issue is unpreserved for appellate review]). It is undisputed that appellant did not raise the issue of whether the fifth Miranda warning was deficient at either the suppression hearing or at the fact-finding hearing. Therefore, it is unpreserved for our review.
Whether Appellant's Written Confession was Involuntarily Obtained We disagree with our dissenting colleagues finding that Detective Barrenger's alleged use of guile to extract a written [*7]confession from appellant without his mother present leads to the conclusion that the apology letter was involuntarily made. We stress that whether the written confession was obtained voluntarily need not be addressed today in light of the dissent's conclusion that Family Court properly denied suppression of appellant's oral statements.
However, even if we were to consider the dissent's argument, we find that the written confession was voluntary. In finding deception on the part of the police that results in involuntariness, there must be "some showing that the deception was so fundamentally unfair as to deny due process" (People v Tarsia, 50 NY2d 1, 11 [1980]). Although the dissent makes a compelling argument that juveniles do not think the same way as adults, we believe that the holding in Jimmy D. necessitates the conclusion that appellant's written confession was voluntary under the totality of the circumstances (15 NY3d at 423).
The dissent argues that the absence of appellant's mother weighs heavily in determining the voluntariness of the statement. Just as in Jimmy D., Detective Barrenger elicited an oral and written confession from appellant while his mother was outside of the interrogation room (id. at 420-421). The Court of Appeals emphasized that one of the advantages of having a parent present is that a parent is "able to monitor the interrogation lest the police engage in coercive tactics" and "the emotional and intellectual immaturity of a juvenile creates an obvious need for the advice of a guardian...at an interrogation from which charges of juvenile delinquency may ensue." (id. at 422 [internal quotation marks omitted]).
However, this right is not absolute as a child's confession obtained in the absence of a parent is not per se involuntary (id.). The factors we consider are whether the parent escorts the child to the place of interrogation, they have an opportunity to talk while there, the parent is present during the Miranda warnings, both agree to the child being questioned outside of the mother's presence, the child does not ask for the parent during questioning and the child's whereabouts are not concealed from the parent (id. at 423). A written confession is validly obtained after a clear oral confession, particularly when, as here, there is no deception on the part of the detective (id. at 424).
Here, the factors weigh in favor of finding that the absence of appellant's mother did not affect the voluntariness of appellant's confession. Although appellant was not escorted by his mother to the precinct, they had an opportunity to talk while at the precinct. Furthermore, both appellant and his mother were present during the Miranda warnings and both agreed to appellant being questioned without his mother present. At no point during any of the questioning did appellant ask for his mother and there is nothing in the record to suggest that appellant's whereabouts were concealed. Accordingly, appellant and his mother were not so isolated from one another as to affect the likelihood that his confession was voluntary and we disagree with the dissent's contention that the simple absence of appellant's mother weighs heavily against this finding.
The cases cited by the dissent from around the country do not merit a different result. In Commonwealth v Bell (365 SW3d 216, 224 [Ky Ct App 2012]), a 13-year-old boy's oral confession was held to be invalid when he was escorted by school officials into a room and repetitively questioned by police officers in his school building. In addition, the police officers feigned superior knowledge of what happened and repeatedly demanded answers (id. at 225). The fact that the interrogation occurred in a school building factored heavily into the court's reasoning (id. at 224-225 ["a school is where compliance with adult authority is required and where such compliance is compelled almost exclusively by the force of authority. Like it or not, that is the definition of coercion"]).
Similarly, the California Court of Appeals' decision in In re Elias V. (237 Cal App 4th 568 [Cal Ct App 2015]), is inapplicable to the facts at hand. As in Bell, the detective interrogated the child at his school (id. at 581). The child was brought by the principal to a small [*8]room, containing a single desk with three chairs, and a uniformed deputy stood outside of the door (id.). The court made a point in highlighting that "the mere fact of police questioning of a minor in the schoolhouse setting may have a coercive effect, because the child's presence at school is compulsory and his disobedience at school is cause for disciplinary action" (id. [internal quotation marks and brackets omitted]). To make matters worse, the detective engaged in an interrogation technique known as the Reid methodology, the use of which led to the Supreme Court's decision in Miranda v Arizona (384 US 436 [1966]). The court in Elias, found that the use of the school building in conjunction with the coercive nature of the Reid methodology unfairly induced the child to incriminate himself (Elias V. at 589).
Even if we were to ignore Jimmy D., the cases cited by the dissent are readily distinguishable. In both Bell and Elias, the respective courts emphasized that the location of the interrogation, i.e. the school, is inherently coercive in and of itself. The dissent contends that we attempt to distinguish these cases by relying on the fact that these interrogations of children were considered coercive because they occurred in the school.
However, we emphasize that it is the courts themselves that make these distinctions (see Bell, 365 SW3d at 224 ["a school is where compliance with adult authority is required and where such compliance is compelled almost exclusively by the force of authority. Like it or not, that is the definition of coercion"]; Elias, 237 Cal App 4th at 581 ["the mere fact of police questioning of a minor in the schoolhouse setting may have a coercive effect, because the child's presence at school is compulsory and his disobedience at school is cause for disciplinary action"] [internal quotation marks and brackets omitted]).
In contrast, in New York, when a child is questioned at the precinct, the officer should take the child to a designated juvenile interview room, consisting of a clean, well-lit room that is separate from areas accessible to the general public and adult detainees, and which is in an office-like rather than jail-like setting that minimizes public exposure and mingling with detainees (Family Ct. Act § 305.2[4][b]; see Uniform Rules for Trial Cts. [22 NYCRR] § 205.20). Appellant was questioned in the SVU's designated juvenile room that comported with the Family Court Act. The dissent's argument that the designated juvenile room that follows the guidelines set forth in the Family Court Act is somehow only slightly less coercive than a school is not persuasive.
In addition, both out-of-state cases analyzed whether the alleged oral confessions were voluntary and found the school to have a coercive effect. As the dissent has conceded that appellant's oral confession is voluntary, we fail to see the applicability of these cases to the facts at hand. Neither case analyzes whether a written confession is involuntary when an officer gives simplified Miranda warnings to the child with the mother present who then voluntarily leaves the interrogation room and then asks a child to write an apology letter after the officer obtains a valid oral confession. Finally, there is no evidence in the record that Detective Barrenger used the Reid methodology in questioning appellant. This fact alone renders the holding in Elias unpersuasive.
The dissent also points to State of Ohio v Bohanon (2008 WL 660536, 2008 Ohio App Lexis 933, 2008 - Ohio - 1087 [2008]). In Bohanon, the Ohio Court of Appeals held that a written confession was involuntarily obtained when a detective recommended that a mildly mentally retarded woman who suffered from a psychotic disorder and was on multiple anti-psychotic drugs write an apology letter for her behavior (id. at ¶¶ 7-11). The dissent posits that, as in Bohanon, appellant's Fifth Amendment rights were offended because of his young age, inexperience with the juvenile justice system and his mother's absence after appellant had asked his mother to leave the interrogation room. However, the holding in Bohanan is limited to how the Ohio courts treat the written confessions of the mentally infirm and not how the courts should handle juveniles, such as appellant. There is no question that appellant understood the Miranda [*9]warnings before giving an oral and written confession.
In sum, Detective Barrenger did not engage in deceptive or coercive practices. There is no doubt that Detective Barrenger questioned appellant in accordance with Family Court Act § 305.2. Detective Barrenger, after appellant orally confessed, asked one time, if he would like to write an apology letter. Appellant was free to refuse this offer. There was no ongoing or coercive conversation. Only when appellant answered that he would like to write the letter, did Detective Barrenger give appellant a pen and paper and leave the room while appellant wrote the letter. Nor do the contents of the apology letter suggest that it expressed anything other than appellant's own recollections and simply reiterated what appellant had already orally confessed to Detective Barrenger (Jimmy D., 15 NY3d at 423).
We note that there is no case law for the proposition, as the dissent suggests, that appellant's mother had to be made aware of the fact that the detective was going to ask appellant to write an apology letter, in order for the written apology letter to be voluntary. Here, given appellant's valid waiver of his rights and his voluntary oral confession, there is no basis either legally or factually to find that Detective Barrenger's method in obtaining a written confession was an interceding act that requires the matter to be remanded for a new fact-finding hearing. We are bound by Jimmy D., and the dissent's argument to the contrary is not persuasive.
Finally, we do not believe that appellant's young age and inexperience with the juvenile justice system leads to the conclusion that the apology letter was involuntary. The record does not support the dissent's position that appellant did not understand that the apology letter would be given to the court because of his young age and inexperience with the judicial system. The record establishes that appellant understood the meaning of the Miranda warnings given to him by Detective Barrenger. Upon cross-examination, he was able to summarize, in his own words, what each of the warnings meant.
Accordingly, we find that under the totality of the circumstances, appellant's written statement was voluntarily made.
Whether There is Sufficient Corroboration
After finding that appellant's confessions were voluntary, we turn to whether there is sufficient corroboration. Family Court's finding is based on legally sufficient evidence and is not against the weight of the evidence (see People v Danielson, 9 NY3d 342, 349 [2007]). We agree with the dissent that the lack of DNA records or an eyewitness necessitates that we examine whether there is sufficient corroboration. We note however that eyewitnesses are not necessary to corroborate L.F.'s testimony of sexual abuse (see generally Matter of Jimmy D., 15 NY3d at 424 [holding that the lower court's decision was properly corroborated even where the only eyewitness was the victim]; Matter of Johnny H., 111 AD3d at 576 [same]).
It is axiomatic that we may review the entire record even when a lower court's factual findings are limited (see Criminal Procedure Law 470.15[5]; Danielson, 9 NY3d at 342; Matter of Traekwon I., 152 AD3d 431 [1st Dept 2017]. Here, the record sufficiently corroborates appellant's oral and written confessions (Criminal Procedure Law § 60.50 ["(a) person may not be convicted of any offense solely upon evidence of a confession or admission made by him without additional proof that the offense charged has been committed"]). Corroboration "does not mandate submission of independent evidence of every component of the crime charged but merely requires some proof, of whatever weight, that a crime was committed by someone" (People v McGee, 20 NY3d 513, 517 [2013] [internal quotation marks omitted]).
L.F., at the fact-finding hearing, described in graphic detail what occurred when he was alone with appellant. His testimony was consistent with appellant's oral confession as well as what he said to his mother after being sexually abused.
Importantly, appellant's confession is corroborated by the medical records, which were properly admitted into evidence by Family Court. Appellant does not challenge the Montefiore [*10]records but claims that the CAC records are inadmissible on the theory that they were prepared for litigation. Hospital records are admissible under the business records exception to the hearsay rule when they reflect "acts, occurrences or events that relate to diagnosis, prognosis or treatment or are otherwise helpful to an understanding of the medical or surgical aspects" of the patient's hospitalization (People v Ortega, 15 NY3d 610, 617 [2010] [internal quotation marks omitted]). Statements in medical records that are sufficiently related to diagnosis and treatment are admissible (People v Parada, 67 AD3d 581, 582 [1st Dept 2009], affd on other grounds 17 NY3d 501 [2011]). Furthermore, testimony regarding a child sexual abuse victim's responses, when asked by a CAC nurse practitioner about why he was at the CAC, are properly admitted as an exception to the hearsay rule to the extent that the statements are "germane to diagnosis and treatment" (People v Spicola, 16 NY3d 441, 451 [2011], cert denied 565 US 942 [2011]).
Here, L.F.'s primary care physician referred the family to the CAC, which has specialists in the detection, diagnosis and treatment of child sexual abuse. There is no evidence in the record, as the dissent contends, that L.F. was referred to CAC for investigatory rather than treatment purposes by his primary care physician. The CAC provides a multidisciplinary approach designed to prevent child victims from being subjected to repeated interviews with similar questions, needlessly causing trauma to the child victim. The evidence appellant challenges is Dr. Cahill's notation in her medical evaluation that L.F. had been referred because of sexual abuse by the 14-year-old son of his father's girlfriend, and that the doctor had conducted a forensic interview during which L.F. had "described what he experienced and it included anal and oral sodomy".
As this evidence is germane to L.F.'s treatment, it was properly admitted by Family Court. Although appellant contends that one purpose of CAC's interview was intended to be used by law enforcement personnel, the statements made by L.F. to Dr. Cahill were also made for the purposes of treatment and diagnosis, and therefore were properly admitted under the business records exception.
Whether the Admission of the Apology Letter was Harmless Error
In finding that appellant's apology letter was involuntary, the dissent goes on to argue that Family Court's admission of the written apology letter was not harmless beyond a reasonable doubt, and would remand the matter for a new fact-finding hearing. Even accepting, arguendo, that the written confession was involuntarily obtained, we disagree that a new hearing is mandated. "A trial court's error involving a constitutionally protected right is harmless beyond a reasonable doubt only if there is no reasonable possibility that the error might have contributed to defendant's conviction'" (Matter of Delroy S., 25 NY3d 1064, 1066 [2015], quoting People v Crimmins, 36 NY2d 230, 237 [1975]).
We disagree with the dissent's reliance upon People v Hardy (4 NY3d 192 [2005]) and People v Marinez (121 AD3d 423 [1st Dept 2014]). In Hardy, the only evidence that inculpated the defendant was the testimony of a person with a dubious criminal history and the plea allocution of a nontestifying codefendant (4 NY3d at 198-199). The plea allocution was admitted by the People to be critical to their case. It was also found that the jury used the plea allocution to find the defendant guilty of all counts against the express instructions of the court (id. at 199).
In Marinez, police officers searched the defendant's phone without obtaining a warrant, subsequently finding two photographs that depicted a pistol that was recovered at a separate location (121 AD3d at 423). We held that since the principal issue was the defendant's connection to the weapon, which rested entirely on the credibility of the officers, and the prosecution "emphatically relied" on the photos in summation, the conviction would not have occurred except for the admission of the photos (id. at 424).
As we discussed in further detail, supra, appellant's oral confession was corroborated by [*11]the testimony of L.F., L.F.'s mother, and the medical records of both Montefiore and CAC. We reject the dissent's contention that the written confession was an important element of the presentment agency's case relied upon by Family Court as "more reliable and more detailed than [appellant's] oral statements." The oral confession, as the presentment agency notes, is "compelling evidence of guilt." Appellant admits to putting his "peanuts" in L.F.'s "mouth" and "butt." In the written confession, appellant simply apologizes for the sexual abuse.
The written confession was not given greater weight than other evidence of guilt, and the dissent's argument to the contrary is not supported by the record. Family Court makes a distinction between the two confessions. Moreover, given that the evidence of appellant's guilt was overwhelming, there is no merit to the dissent's contention that the alleged error of admitting appellant's written confession may have contributed to his conviction.
We have considered appellant's remaining contentions and find them unavailing.
Accordingly, the order of disposition of the Family Court, Bronx County (Sarah P. Cooper, J.), entered on or about February 9, 2016, which adjudicated appellant a juvenile delinquent upon a fact-finding determination that he committed acts that, if committed by an adult, would constitute the crimes of criminal sexual act in the first degree (two counts), sexual abuse in the first degree (two counts), sexual misconduct (two counts), and endangering the welfare of a child, and placing him on probation for a period of 18 months, should be affirmed, without costs.
All concur except Acosta, P.J. and Gesmer, J. who dissent in an Opinion by Gesmer, J.




GESMER, J (dissenting)


I respectfully dissent.
This appeal asks us to consider the distinction between acceptable behavior by law enforcement when questioning a juvenile as compared to when questioning an adult. In the interrogation before us, the detective used deception, a tactic frequently approved by our courts in adult interrogations. However, here, the suspect subjected to this police deception was appellant Luis P., a 13-year-old boy with no prior experience in the criminal justice system, alone in a room with the detective. The detective obtained his written confession by suggesting that Luis write an "apology letter" to the complainant. Under these circumstances, I would hold that the presentment agency did not meet its burden beyond a reasonable doubt of proving that Luis's written statement was voluntary. In addition, I would conclude that the admission of his written statement at the fact-finding hearing was not harmless beyond a reasonable doubt, even though the judge properly admitted his oral statements. Accordingly, I would suppress the written statement, reverse the order of disposition and remand for a new fact-finding hearing.
In December 2014, Luis was charged with committing acts that, if committed by an adult, would constitute the offenses of criminal sexual act in the first degree, sexual abuse in the first degree, sexual misconduct, and endangering the welfare of a child. The petition alleged that, on one occasion in July 2014, Luis touched his penis to the mouth and buttocks of his mother's boyfriend's son, nine-year-old L.F.
Luis filed a motion in Family Court in January 2015, seeking, as relevant here, to suppress the statements he made to Detective James Barrenger in September 2014. The court granted that branch of the motion to the extent of ordering a Huntley hearing (People v Huntley, 15 NY2d 72, 78 [1965]) to determine whether those statements were admissible.
At the hearing in February 2015, the presentment agency called only Detective Barrenger to testify. Luis testified on his own behalf, and he called his grandmother as a witness. The Family Court credited Detective Barrenger's testimony but did not credit Luis's testimony. The [*12]Family Court credited Luis's grandmother's testimony, but found it to be irrelevant. The Family Court did not make extensive findings of fact. Deferring to the trial judge's credibility findings (see Matter of Denzel F., 44 AD3d 389, 389-390 [1st Dept 2007]; Matter of Chauncey T., 24 AD3d 682, 683 [1st Dept 2005]), the relevant facts proven at the hearing are as follows.
Sometime before September 25, 2014, Detective Barrenger contacted Luis's mother and asked her to bring Luis to the precinct to be arrested. On September 25, 2014, Detective Barrenger met with Luis and his mother at the precinct in a room used to interview juveniles. Detective Barrenger had been assigned to the Special Victims Unit for 2 1/2 years, but had no specific training in interviewing children. Detective Barrenger read the juvenile version of Miranda warnings to Luis and his mother [FN4]. Detective Barrenger asked Luis and his mother if they understood each of the warnings and they responded in the affirmative. Luis and his mother also each signed the document from which Detective Barrenger read the warnings. Detective Barrenger informed Luis that he wanted to ask him questions about the alleged incident with L.F. Luis responded that he did not want to discuss that in front of his mother. Detective Barrenger asked Luis's mother whether "she was all right with that, if she wanted to leave the room." Luis's mother indicated that she was, and left.
With only Luis alone in the interview room with Detective Barrenger, the detective asked Luis about the incident with L.F. Luis told Detective Barrenger that he put his "peanuts" in L.F.'s "mouth and . . . butt." When Detective Barrenger asked Luis what he meant by "peanuts," Luis responded his "front private." Detective Barrenger asked Luis whether he meant his penis and Luis said yes. Detective Barrenger then "asked [Luis] if he would like to write an apology letter to [L.F.] and he replied yes." Detective Barrenger explained the "apology letter" to Luis as a "letter apologizing to [L.F.] for what had happened." In response to a question on cross-examination, Detective Barrenger explained that he had asked Luis to write the "apology letter" in order to obtain a statement as to "what if anything happened with [L.F.]," but he did not explain to Luis that this was his purpose. Detective Barrenger did not believe that he had explained to Luis that he was going to show the "apology letter" to the judge and use it against Luis in court. Detective Barrenger did not tell Luis that he could refuse to write the letter. He also did not testify that Luis could discuss with his mother whether he wanted to write the "apology letter."
The "apology letter," which was admitted into evidence at the Huntley hearing, stated the following:
"Dear [L.F.],
"Im [sic] sory [sic] for what I did. I know it was the wrong thing to do [sic] But when I was little I was abused sexually by my brother [A.] and I didn't know any better. But Im [sic] sorry for putting my peanuts in your butt and I wont [sic] do it again [sic] I know its [sic] wrong but we didnt [sic] know any better and im [sic] sorry for touching you all the times you would put your pants down. I promise it wont [sic] happen again. Im [sic] going to seek help and Im [sic] going to get help. Im [sic] also sorry for the time I put my peanuts in your mouth. But Im [sic] really sorry sorry [sic] for doing these things to you, it wont [sic] happen again. Please forgive me for doing this to you.
"Sincerly [sic],
"Luis P[.]"
Luis argued that his statements should be suppressed because, inter alia, the presentment agency had not met its burden of proving beyond a reasonable doubt that he had made his oral and written statements voluntarily, considering the totality of the circumstances. The presentment agency argued that it had met its burden, noting that Luis's mother was present when he waived his Miranda rights, and that her absence during his oral and written statements did not require that they be suppressed. The Family Court denied Luis's suppression motion. I would reverse that decision and grant Luis's suppression motion to the extent of suppressing the written "apology letter" and remanding for a new fact-finding hearing.
At a Huntley hearing, the presentment agency bears the burden of proving beyond a reasonable doubt that the child made the challenged statement voluntarily beyond a reasonable doubt (People v Witherspoon, 66 NY2d 973 [1985]). "Statements must not be products of coercion, either physical or psychological, meaning that they must be the result of a free and unconstrained choice by their maker (People v Jin Cheng Lin, 26 NY3d 701, 719 [2016] [internal quotation marks and citations omitted]; see also Family Ct Act § 344.2[2][b]). When any defendant challenges the voluntariness of his statement, including one made after Miranda warnings, we must examine the totality of the circumstances under which the statement was made (People v Guilford, 21 NY3d 205, 208 [2013]; see also People v Thomas, 22 NY3d 629, 641-642 [2014]; People v Aveni, 22 NY3d 1114, 1117 [2014]). This analysis requires that we review the specific circumstances of the case before us, including both the " characteristics of the accused'" and the " details of the interrogation'" (Guilford, 21 NY3d at 208, quoting Dickerson v United States, 530 US 428, 434 [2000]). The Court of Appeals has instructed us that we must analyze the statements of children under the totality of the circumstances (Matter of Jimmy D., 15 NY3d 417, 423 [2010]). Relevant factors include "the juvenile's age, experience, education, background, and intelligence, and . . . whether he has the capacity to understand the warnings given [to] him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights" (Fare v Michael C., 442 US 707, 725 [1979]). In Matter of Jimmy D., our Court of Appeals "[r]ecogniz[ed] that special care must be taken to protect the rights of minors in the criminal justice system" (Jimmy D., 15 NY3d at 421), echoing the holding by our colleagues in the Second Department that "[i]t is well recognized that over and beyond the ordinary constitutional safeguards provided for adults subjected to questioning, the police must exercise greater care to insure that the rights of youthful suspects are vigilantly observed" (People v Gotte, 150 AD2d 488, 488 [2d Dept 1989], lv denied 74 NY2d 896 [1989] [internal quotation marks omitted]; accord Matter of Robert P., 177 AD2d 857, 858 [3d Dept 1991]; People v Smith, 217 AD2d 221, 232 [4th Dept 1995], lv denied 87 NY2d 977 [1996])[FN5]. Accordingly, this precedent must govern our analysis of the interrogation of a juvenile.
Application of the analysis set out in Jimmy D. to the facts of this case requires us to [*13]conclude that Luis's written statement was involuntarily made. That result is compelled by our consideration of three factors in particular: Luis's young age and inexperience, the absence of his mother or another trusted adult at the time he wrote the "apology letter," and Detective Barrenger's use of deception.
First, in this analysis, important " characteristics of the accused'" (Guilford, 21 NY3d at 208, quoting Dickerson, 530 US at 434) include Luis's young age and lack of experience with the juvenile justice system (see Gotte, 150 AD2d at 488). Both the United States Supreme Court and our Court of Appeals have recognized that young people, as compared to adults, lack maturity and sophistication, and are prone to impetuosity and recklessness (see Montgomery v Louisiana, - US -, 136 S Ct 718, 733-734 [2016]; Miller v Alabama, 567 US 460, 477-478 [2012]; J.D.B. v North Carolina, 564 US 261, 272-273 [2011]; Graham v Florida, 560 US 48, 78 [2010]; Jimmy D., 15 NY3d at 422; Matter of Benjamin L., 92 NY2d 660, 669 [1999]; People ex rel. Wayburn v Schupf, 39 NY2d 682, 687-688 [1976]). As a result, as the Supreme Court has noted, "[C]hildren cannot be viewed simply as miniature adults" (Miller, 567 US at 481, quoting J.D.B., 564 US at 274). Consistent with this, the Court has stated that a juvenile being interrogated "cannot be compared with an adult in full possession of his senses and knowledgeable of the consequences of his admissions" (Gallegos v Colorado, 370 US 49, 54 [1962]), and that "the greatest care must be taken to assure that [a juvenile's] admission was voluntary, in the sense not only that it was not coerced or suggested, but also that it was not the product of ignorance of rights or of adolescent fantasy, fright or despair" (In re Gault, 387 US 1, 55 [1967]).
Second, the absence of Luis's mother at the time he wrote the "apology letter" weighs heavily against finding that it was a voluntary statement. While the Court of Appeals held in Matter of Jimmy D. that a confession obtained from a juvenile in the absence of a parent is not, as a matter of law, involuntarily made, it carefully emphasized the importance of the presence of a parent or other appropriate adult when a juvenile is interrogated. It explained that the many "advantages of having a parent present during custodial interrogations" (id. at 422) may include helping a child to understand the Miranda warnings and the potential consequences of waiving those rights, and, if a child chooses to waive Miranda rights, "monitor[ing] the interrogation lest the police engage in coercive tactics" (id. at 422). The Court went on to conclude "[t]he emotional and intellectual immaturity of a juvenile creates an obvious need for the advice of a guardian . . . at an interrogation" (id. [internal quotation marks omitted]), with the result that "New York courts carefully scrutinize confessions by youthful suspects who are separated from their parents while being interviewed" (id. at 421).
Here, Detective Barrenger did not suggest to Luis that he write an "apology letter" to L.F. until after his mother had left the room. Accordingly, Luis was without the guidance or advice of a parent or other trusted adult at the time that he followed the detective's suggestion to write an "apology letter."
The presentment agency notes that Luis asked his mother to leave of his own accord, unlike the situation in Jimmy D., where the detective herself suggested that Jimmy's mother leave (Jimmy D., 15 NY3d at 420). However, Luis's request that his mother leave is not dispositive. Luis asked his mother to leave the interview room after Detective Barrenger had only asked him to speak about the alleged incident; Detective Barrenger did not suggest that Luis write the "apology letter" until after his mother was already gone. Moreover, Detective Barrenger did not at that point suggest to Luis that he could refuse to write the "letter," or that he could discuss the "apology letter" with his mother. Since Detective Barrenger did not suggest that Luis write the "apology letter" until after Luis's mother had left the room, she could not serve the important monitoring role recognized by the Court of Appeals and potentially protect her son from the detective's deceptive tactics. Moreover, not providing Luis's mother an [*14]opportunity to weigh this intended use of deception as part of her decision to leave seems to run afoul of the "better practice" for juvenile interrogations identified by the Court of Appeals (id. at 722 [noting that a parent should not be discouraged from attending a child's interrogation either "directly or indirectly"])[FN6].
Third, I find particularly significant Detective Barrenger's use of deception. Police deception of an adult defendant "need not result in involuntariness without some showing that the deception was so fundamentally unfair as to deny due process" (People v Tarsia, 50 NY2d 1, 11 [1980]). However, in "the specific context of police interrogation, events that would leave a man cold and unimpressed can overawe and overwhelm a [teen]" (J.D.B., 564 US at 272 [internal quotation marks omitted]). Thus, courts have concluded that interrogation tactics that might not render an adult's statement involuntary may be unacceptable with a juvenile. In Commonwealth v Bell (365 SW3d 216, 225 [Ky Ct App 2012]), the Kentucky Court of Appeals concluded that the statement of a 13-year old suspect was involuntarily made when, inter alia, he was questioned alone in a separate room at his middle school by detectives who "feigned superior knowledge" of a sexual assault that he had allegedly perpetrated, insisted that he had committed the assault, and continued the interrogation for 32 minutes until he confessed. The court rejected the prosecution's argument that the young suspect's statement was voluntary because he was questioned in a calm and conversational tone, was not deprived of food or sleep, was read his Miranda rights, and was not told that he was under arrest (Bell, 365 SW3d at 224). Rather, that court explained, "These . . . statements may serve to assure an adult, or even a mature minor, that he should feel free of coercion, that he is free to say nothing and even to leave the officers' presence any time he desires. However, we do not believe they provided that same assurance, under these circumstances, to this thirteen-year-old boy" (id.).
Here, the hearing record is devoid of any evidence that 13- year-old Luis had ever before been arrested or subjected to police interrogation [FN7]. He was provided a simplified Miranda warning informing him that the detective could tell the court what he said or wrote in order to prove what he may have done. However, Detective Barrenger suggested to Luis that he write the "letter" to "apologiz[e] to [L.F.] for what had happened." It is quite likely that Luis did not understand that this "letter" would be given to the court.
Indeed, the case law suggests that an inexperienced 13-year-old would be more likely to believe that "a letter apologizing to [L.F.]" was just that, and would be less likely to understand that the "letter" could be used against him (see Jimmy D., 15 NY3d at 422 ["[J]uveniles charged with delinquency may not fully understand the scope of their rights and how to protect their own interests. They may not appreciate the ramifications of their decisions . . . ."] [internal quotation [*15]marks omitted]).[FN8]
For example, in In re Elias V. (237 Cal App 4th 568, 587, 593 [Cal Ct App 2015]), the First District of the California Court of Appeal found an inexperienced 13-year-old's statement involuntary, based in part on a detective's use of a deceptive methodology. The California Court of Appeal explained its concerns, in part, by stating that, "There appears to be a growing consensus—-among the supporters of those [interrogation] techniques, not just the critics—-about the need for extreme caution in applying them to juveniles" (id. at 587)[FN9]. Indeed, other courts have also taken the view that certain interrogation tactics raise greater concerns of involuntariness when used with juveniles (see e.g. D.L.H., Jr., 392 Ill Dec at 520, 32 NE2d at 1096 ["Though an adult might very well have been left cold and unimpressed' with [the detective's] mode of questioning, respondent was just a boy of nine, functioning at the level of a seven- or eight-year-old, and thus far more vulnerable and susceptible to police coercion of this type [internal citation omitted]); Jerrell C.J., 283 Wis 2d at 163, 699 NW2d at 119 ["Not only did the detectives refuse to believe Jerrell's repeated denials of guilt, but they also joined in urging him to tell a different truth,' sometimes using a strong voice' that frightened' him. . . . . [W]e remain concerned that such a technique applied to a juvenile like Jerrell over a prolonged period of time could result in an involuntary confession"]).[FN10]
Here, Detective Barrenger used deception to procure Luis's written statement by disguising his request for a written statement as an opportunity to write L.F. an "apology letter." While courts have condoned a detective's request that an adult suspect write an apology letter to a complainant as part of an interrogation (see People v Scott, 212 AD2d 1047 [4th Dept 1995], [*16]affd 86 NY2d 864 [1995]); State of Maine v LaVoie, 2010 ME 76 ¶ 22, 1 A3d 408, 414 [2010]), juveniles do not think the same way as adults and thus "may not fully understand the scope of their rights" nor "appreciate the ramifications of their decisions" (Jimmy D., 15 NY3d at 422 [internal quotation marks omitted]). Detective Barrenger's request that Luis write L.F. an "apology letter" struck at the core of Luis's right against self-incrimination and muddied the substance of the applicable juvenile Miranda warning. Detective Barrenger had warned Luis that he could tell the court what Luis said or wrote to prove what he may have done. However, the "apology letter" was not addressed to the court, nor was it addressed to Detective Barrenger. It was presented as a chance for Luis to apologize to L.F. Accordingly, in order to find that Luis was not deceived by this request, we would have to find that a 13-year old boy, with no apparent experience in the juvenile justice system, could appreciate the application of his Fifth Amendment rights to this apparently innocent "letter."[FN11] That conclusion would be inconsistent with the body of case law firmly holding that children do not think the same way as adults [FN12]. Moreover, in reviewing the totality of the circumstances, I find this use of deception on a person of Luis's age and inexperience aggravated by the fact that Luis's mother was not present when Luis was asked to write the "letter." While Luis's mother, an adult, may have been able to recognize that the "letter" could be used against her son, she was never made aware that this request would be made before she left the interview.
By way of analogy, Luis cites State of Ohio v Bohanon (2008 WL 660536, 2008 Ohio App LEXIS 933, 2008 - Ohio - 1087 [2008]), a case in which the Court of Appeals of Ohio held that the defendant's written apology letter to the complainant was involuntary, taking into account her limited intellect and psychological impairment. As that court explained, "Perhaps an Oxford don would have recognized the legal implications that an apology would have, but someone of appellee's limited intelligence and psychological condition would not" (id. at ¶ 11). While Luis's situation differs from that of an intellectually and psychologically disabled adult, the Bohanon court's conclusion underscores a significant point. Disguising a request for a written confession as an opportunity to write an apology letter to a complainant raises a genuine risk of offending a suspect's Fifth Amendment rights. In Bohanon, that risk rose to the level of involuntariness because of the defendant's limited mental capacity. In this case, that risk rose to the level of involuntariness because of Luis's young age and inexperience with the juvenile justice system, coupled with his mother's absence.
As the Court of Appeals has stated, " A series of circumstances may each alone be [*17]insufficient to cause a confession to be deemed involuntary, but yet in combination they may have that qualitative or quantitative effect'" (Jin Cheng Lin, 26 NY3d at 719, quoting People v Anderson, 42 NY2d 35, 38 [1977]). Here, the combination of Luis's young age and inexperience with the juvenile justice system, the absence of his mother at the time he was asked to write the "apology letter," and Detective Barrenger's deceptive use of the "letter" to procure a written statement, lead me to conclude that the statement embedded in the "apology letter" was involuntarily made.
I reach a different conclusion as to Luis's earlier oral statements. Unlike the "apology letter," Luis's oral statements did not flow from the use of deception. Detective Barrenger's request that Luis speak about the alleged incident directly followed the juvenile Miranda warnings. Since no deception was used to elicit his oral statements, Luis's oral statements about the alleged incident, even though elicited without his mother present, raise fewer concerns. In addition, Luis's mother left the interview room knowing that Luis would be speaking about the alleged incident in her absence, while she did not know that he would be asked to write the "apology letter." Similarly, Luis asked her to leave expecting to talk about the alleged incident with Detective Barrenger without his mother present, unlike the "apology letter," which was not suggested to him until after she had already left. In their totality, the circumstances do not weigh in favor of finding Luis's oral statements involuntary as they do with respect to the written "apology letter." Accordingly, I conclude that the Family Court properly denied the suppression of Luis's oral statements.
I turn now to the question of whether the admission of the written "apology letter" was harmless error [FN13]. An error involving a constitutional right is harmless only when it is "harmless beyond a reasonable doubt," meaning that "there is no reasonable possibility that the error might have contributed to defendant's conviction" (People v Crimmins, 36 NY2d 230, 237 [1975]). This analysis applies with equal force in juvenile delinquency proceedings (see Matter of Delroy S., 25 NY3d 1064, 1066 [2015]).
Here, neither DNA nor other physical evidence connected Luis to the alleged incident. There were also no eyewitnesses to the alleged incident. In addition, no medical evidence proved that L.F. had been abused sexually; the doctor who examined L.F. only observed an anal fissure that could have been caused by a hard bowel movement [FN14]. Accordingly, the presentment agency's proof that Luis had sexually assaulted L.F. rested only on the testimony of L.F. and the corroboration offered by its other witnesses, Luis's admissions, and statements made by L.F. to the doctors who examined him. Thus, Luis's written "apology letter" was an important piece of the presentment agency's case. The presentment agency stressed its importance by reading it into the record during summation and highlighted that its evidence against Luis included an admission "in his own handwriting." That the presentment agency itself viewed the written "apology letter" as an important piece of evidence supports the conclusion that its admission was not harmless beyond a reasonable doubt (see People v Hardy, 4 NY3d 192, 199 [2005]; People v Marinez, 121 AD3d 423, 424 [1st Dept 2014]; Wood v Ercole, 644 F3d 83, 98-99 [2d Cir 2011]). [*18]Notably, the Family Court cited the "apology letter" in finding that the presentment agency had proven its case beyond a reasonable doubt.
Furthermore, the admission of Luis's oral statement does not render harmless the admission of his written statement. The Court of Appeals has held that the failure to suppress a written statement is not harmless error simply because a different oral statement of the accused has been found admissible, because "written materials . . . ordinarily are looked at as more reliable than their more evanescent oral counterparts, which are so much more often subject to the vagaries of memory and narration" (People v Garofolo, 46 NY2d 592, 602 [1979])[FN15]. In addition, the written "apology letter" was more detailed than Luis's oral statements, which is another factor to consider in a case involving cumulative statements (see People v Schaeffer, 56 NY2d 448, 455 [1982]).
Since the written "apology letter" was an important component of the presentment agency's case, was expressly relied upon by the Family Court in adjudicating Luis a juvenile delinquent, and because it was both more reliable and more detailed than Luis's oral statements, I would hold that its admission was not harmless beyond a reasonable doubt. While Luis
has completed the placement ordered by the Family Court, the allegations in the petition are serious, and I would decline his request that we dismiss the petition as a remedy upon reversal. Instead, I would remand for a new fact-finding hearing.[FN16]
Order of disposition of the Family Court, Bronx County (Sarah P. Cooper, J.), entered on or about February 9, 2016, affirmed, without costs.
Opinion by Singh, J. All concur except Acosta, P.J. and Gesmer, J. who dissent in an Opinion by Gesmer, J.
Acosta, P.J., Tom, Webber, Gesmer, Singh, JJ.
THIS CONSTITUTES THE DECISION AND ORDER
OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: APRIL 12, 2018
CLERK



Footnotes

Footnote 1: The record consists of a Huntley hearing, which occurred on February 5, 2015 and a fact-finding hearing, which occurred on April 15, April 22, April 30, and May 26, 2015. 

Footnote 2: Specifically, Barrenger advised appellant and his mother:
"1. You have the right to remain silent and refuse to answer any questions. That means you don't have to say anything to me.
"2. Anything you say may be used against you in a court of law. That means I can tell the court what you say or write to prove what you may have done.
"3. You have the right to consult an attorney before speaking to the police (or the prosecutor) and to have an attorney present during any questioning now or in the future. That means that you can talk to a lawyer before I ask you any questions and your lawyer can be with you when I ask you any questions.
"4. If you cannot afford an attorney, one will be provided for you without cost. That means that if you want a lawyer but do not have the money to pay for one, a lawyer will be given to you for free.
"5. If you do not have an attorney available, you have the right to remain silent until you have had an opportunity to consult with one. That means if you want a lawyer and a lawyer is not available right now, you do not have to speak with me until you have had the chance to speak to a lawyer.
"6. Now that I've advised you of your rights, are you willing to answer questions."

Footnote 3: The letter stated:
"Dear [L.F.],
"Im sory [sic] for what I did. I know it was the wrong thing to do. But when I was little I was abused sexually by my brother Angel and I didn't know any better. But Im sorry for putting my peanuts in your butt and I wont do it again. I know its wrong but we didnt know any better and Im sorry for touching you all the times you would put your pants down. I promise it wont happen again. Im going to seek help and Im going to get help. Im also sorry for the time I put my peanuts in your mouth. But Im really sorry sorry [sic] for doing these things to you, it wont happen again. Please forgive me for doing this to you.
"Sincerly (sic) [Appellant]"

Footnote 4: The juvenile Miranda warnings provide simplified explanations after each warning. As is relevant here, the juvenile Miranda warnings inform a child that "[a]nything you say may be used against you in a court of law . . . . That means I can tell the court what you say or write to prove what you may have done." 

Footnote 5: These concerns have also been echoed by the highest courts of several other states, who have taken the position that a juvenile's statements to law enforcement should be reviewed with heightened scrutiny (see State v Barker, 149 Ohio St 3d 1, 11-12, 73 NE3d 365, 376 [2016]; In re D.L.H., Jr., 392 Ill Dec 499, 514, 32 NE3d 1075, 1090 [2015]; In re J.F., 987 A2d 1168, 1177 n 16 [DC 2010]; In re Jerrell C.J., 283 Wis 2d 145, 157, 699 NW2d 110, 116 [2005]; In re Andre M., 207 Ariz 482, 485, 88 P3d 552, 555 [2004]; State v Horse, 644 NW2d 211, 218 [SD 2002]).

Footnote 6: Indeed, as one court has stated, " in marginal cases—when it appears the officer or agent has attempted to take advantage of the suspect's youth or mental shortcomings—lack of parental or legal advice could tip the balance against admission'" (A.M. v Butler, 360 F3d 787, 801 n 10 [7th Cir 2004], quoting United States v Wilderness, 160 F3d 1173, 1176 [7th Cir 1998]).

Footnote 7: Luis's lack of experience is significant because, had Luis been an experienced subject of the juvenile justice system, that experience would weigh in favor of finding his written statement voluntarily made (see Michael C., 442 US at 726-727).

Footnote 8: Scholarly literature underscores this point (see e.g. Christine S. Scott-Hayward, Explaining Juvenile False Confessions: Adolescent Development and Police Interaction, 31 Law & Psychol Rev 53, 62-66 [2007] [highlighting that juveniles are "less risk adverse and more impulsive than adults," and that juveniles under the age of 15 are most likely to misunderstand Miranda warnings; Barry C. Feld, Police Interrogation of Juveniles: An Empirical Study of Policy and Practice, 97 J Crim L & Criminology 219, 244—245 [2006] [noting that "interrogation techniques designed to manipulate adults may be even more effective and thus problematic when used against children"]).

Footnote 9: These concerns were underscored by research showing the unreliability of confessions by children, especially when the product of deception (Elias V., 237 Cal App 4th at 588-589). 

Footnote 10: The majority attempts to distinguish my citation to Elias V. and Bell by emphasizing that the children in those cases were interrogated at school, which a child may perceive as coercive. We cannot find as a matter of law that interrogation at a school is inherently more coercive than at a precinct as occurred here, even if the questioning occurs in the slightly more benign juvenile room. The fact, cited by the majority, that some courts have found that an interrogation at a school is coercive by no means proves that an interrogation at a precinct is not. 

Footnote 11: Indeed, while the majority highlights that Luis was able to identify some of his rights when cross-examined at the Huntley hearing, Luis never testified about the application of those rights to the "apology letter."

Footnote 12: The majority's conclusion that Luis could have simply refused to write the "apology letter" or requested to speak with his mother before writing it, is also inconsistent with these cases, and their recognition of children's lesser cognitive and emotional abilities. Moreover, there is no indication that Detective Barrenger told Luis that he did not have to write the "letter." Similarly, there is no indication that Luis realized he was being deceived, and that he would have realized that he might benefit from speaking with his mother about whether to write the "apology letter."

Footnote 13: The presentment agency does not directly label its argument as one of harmless error. However, it does contend that Luis's arguments as to the written "apology letter" do not undermine his oral statements, which were themselves "compelling evidence of guilt."

Footnote 14: Since this medical evidence was inconclusive, the Family Court afforded it no weight in its fact-finding decision.

Footnote 15: This statement by the Court of Appeals is underscored by Detective Barrenger's actions in this case. If Luis's oral admissions were indeed compelling evidence in and of themselves, Detective Barrenger would not have sought a written confession.

Footnote 16: I would also hold that the admission of the CAC records was improper. L.F. received an appropriate examination and treatment at Montefiore Medical Center after alleging that Luis had abused him. He was subsequently referred to the CAC for a "forensic interview" attended by, inter alia, the Presentment Agency, and thus was for investigatory rather than treatment purposes. Accordingly, his statements at the CAC do not fall within the treatment exception, and are inadmissible hearsay (cf. People v Spicola, 16 NY3d 441, 451 [2011], cert denied 565 US 942 [2011]).